**[Cite as *State v. Durst*, 2020-Ohio-607.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

State of Ohio                                        Court of Appeals No. H-18-019

    Appellee                                      Trial Court Nos. CRI2018-0112
                                                   CRI2018-0113
v.                                                      CRI2018-0338
                                                   CRI2018-0405

McClain Lamar Durst

    Appellant                                      **<u>DECISION AND JUDGMENT</u>**

                                              Decided: February 21, 2020

* * * * *

James Joel Sitterly, Huron County Prosecuting Attorney, and
Bambi S. Couch, Assistant Prosecuting Attorney, for appellee.

Sarah A. Nation, for appellant.

* * * * *

**MAYLE, J.**

### Introduction

**{¶ 1}** This case involves four separate sexual assaults against four different victims, by the defendant-appellant, McClain Lamar Durst. All of these assaults occurred in the summer of 2017. The cases were consolidated and tried together before a jury in the Huron County Court of Common Pleas over seven days, beginning on August 21,

2018.  Durst was convicted of two counts of forcible rape, four counts of importuning, four counts of unlawful sexual contact, and a single count of sexual battery.  The trial court sentenced Durst to serve 33 years in prison.  On appeal, Durst raises a number of trial-related errors.  As set forth below, we affirm.

### Facts and Procedural History

{¶ 2} We describe each case in the order in which it was reported to law enforcement, which is opposite of the order in which the incidents are alleged to have occurred.  The first two cases reported to the police involve twin sisters, T.S. and A.S., who were 15 at the time Durst assaulted them.  The third case involves R.L., aged 20, who was physically impaired at the time of the assault.  The last case involves C.B., aged 16.  At the time of these events, Durst was 28 years old.

### Case Nos. 1 and 2 regarding victims T.S. and A.S.

{¶ 3} T.S. and A.S. first met Durst on June 25, 2017, when the sisters were walking from their home in Wakeman, Ohio, to a nearby carryout.  Along the way, they encountered Durst "standing by his car," while visiting a neighbor.  Durst identified himself as "Zack" and asked A.S. for her phone number, which A.S. refused.   Durst was accompanied by his friend, "John," and later that day, John "came up to" to T.S. at the girls' home and asked for her number.  T.S. thought John was "cute," and she gave him her number.

{¶ 4} T.S. began texting with John and Durst, and Durst asked for A.S.'s number.  Ultimately, T.S. gave Durst her sister's "Snapchat" information so that he could

2.

communicate directly with her. T.S. and A.S. each told Durst that they were twins and that they were 15 years old. Durst told the girls that he was "in his 20's" and that he lived in Sandusky.

{¶ 5} Durst and A.S. began texting. On June 26, 2017, Durst asked A.S. if he and John could come over. Many of Durst's text messages that day and evening were sexual in nature, like "U know I'm gonna kiss u right," and "if we come [over] we are gonna wanna mess around" and "Can I see some sexy pix." A.S. told Durst that they could come over but that Durst needed to park away from the house because her parents were still awake.

{¶ 6} T.S., A.S., and their friend, "H.," met Durst and John outside, on the front lawn, for about an hour. T.S. testified that Durst and A.S. disappeared for about 20 minutes into a wooded area that was adjacent to their home. When they returned, A.S. told her sister that Durst "was trying to get her to suck his dick and kiss her." After Durst and John left, Durst texted A.S., "Are you mad at me," and A.S. responded, "Sorry to waste your time…" and "A lot happened too fast. Way too fast. I don't know you like that. * * * Im not that kind of person." Durst responded, "if I kiss you kiss me back if we start messing around Let it Go I guarantee you'll enjoy it.* * * Just hook up with me one time and we will see."

{¶ 7} Durst's assault of A.S. occurred on July 5, 2017. At around 6:00 p.m. that day, A.S. texted Durst for the "favor" of picking her up near her boyfriend's house at 11:00 p.m. and bringing her home. In exchange for the ride, A.S. promised to "pay

3.

[Durst] back." Durst replied, "you know what I want" and it's "no[t] money." A.S. told Durst, "we can fuck before we get to my house * * * and you get what you want and I get what I need and we are both happy."

{¶ 8} At trial, A.S. testified that she did not intend to have sex with Durst "at all" and that she only wrote that "to get a ride home." After picking her up, Durst drove A.S. past her house and took her to Murray Road, about five miles away, in the country. A.S. felt "scared." When he pulled to the side of the road, A.S. opened the car door, intending to run away, but he "pulled [her] back in." A.S. testified that he "held me down and [took] my pants off [and then] [h]e took his pants off as well, and started having sexual intercourse [with me]." A.S. told him, "No, please stop." At trial, A.S. verified that Durst put his penis into her vagina, that he ejaculated, and that he exited the car afterward to get a rag from his trunk. He then used the rag to clean both of them off.

{¶ 9} Durst drove A.S. home around midnight. A.S. did not report the assault to anyone except her best friend, "J.," a couple of days later. She also threw her clothes away, because they reminded her of the event. After the assault, A.S. and Durst texted a number of times. In those texts, A.S. told Durst that she did not have feelings for him. They also texted about a number of other topics such as her softball games and his tattoos. The two stopped communicating after July 8, 2017.

{¶ 10} Durst assaulted T.S. two weeks later. On July 19, 2017, around 11:00 p.m., T.S. and her friend, "H.," were home alone, while T.S.'s parents were working and A.S. was gone. Durst texted T.S. to ask where her sister was, and T.S. told him that she did

4.

not know.  The texting between the two continued for a couple of hours.  A written dialogue of that conversation, as displayed on T.S.'s phone, was admitted as an exhibit.  It establishes that Durst repeatedly asked T.S., or alternatively T.S. and H., for "some head," i.e., fellatio, and that he wanted it "bad."  T.S. gave many responses, including "nope," "not gonna do that," and "Nooo."  On the other hand, she also wrote that she would "if you take us to Walmart first * * * but not * * * before."  Durst responded, "Really.  On the way."  T.S. testified that she gave Durst "mixed signals" so that "he would stop asking."

{¶ 11} T.S. saw Durst drive by her home three times.  In one of their last exchanges, at 1:34 a.m., now July 20, 2017, Durst told T.S. to "Come out to the road" and "let me know when your there [and] I'll pull up."  T.S. responded, "Well im not giving you head."  Durst assured T.S., "I wanna talk real fast and then we will see."  At 1:45 a.m., Durst texted that he was "at the end of your driveway."  Even though T.S. and "H." felt "kind of * * * scared," they went outside "to see what he wanted."

{¶ 12} According to T.S., Durst told "H." to go back inside because "he just wanted to talk to T.S."  T.S. got into the front seat of Durst's car, and Durst told her that "he * * * just * * * wanted to talk[,] but then he kept asking [her] to give him head."  T.S. "kept saying [that she] didn't want to" because "that was nasty."  Durst continued to ask, while also "jerking [himself] off," (masturbating) and "grabbing" her waist and "pull[ing] on [her] side to get [her] closer to him."  T.S. "kept pulling away, [but] he would pull [her] back."  At one point, T.S.'s face and lips touched Durst's exposed penis, and he

5.

tried to get T.S.'s hand "over there." And then, according to T.S., after "pulling me closer, like three times, he pulled me close and pulled my head down * * * [and] ha[d] my neck down by his dick." T.S. confirmed that Durst's penis entered her mouth, for "a couple of seconds." T.S. "kept saying [she] didn't want to" and "he let go after he got * * * [her] mouth on his dick." T.S. got out of the car, and Durst masturbated and told T.S. to "keep it on the low," meaning to "keep it to [herself]." Durst then left. T.S. estimated that she was in Durst's car for about ten minutes.

{¶ 13} T.S. went inside, began to cry and called her grandmother, who told her "to call the cops." At 2:13 a.m., T.S. received a text message from Durst, who wrote, "U mad at me." T.S. responded "Not reall[y]" and "I mean u were forcing me." Durst asked when they could hang out again, and T.S. responded, "never * * * because that's fucked up." Durst responded, "Im sorry I had u come out side."

{¶ 14} Huron County Sheriff Deputy Jaclyn Smith responded to the dispatch first and was followed by Deputy John Vogel, both of whom testified at trial. While en route to the sisters' home, Vogel called his supervisor, Huron County Detective William Duncan. Deputy Vogel advised Detective Duncan of an alleged sexual assault of a minor, and Duncan asked that Vogel call him again if any evidence needed to be collected. Otherwise, Detective Duncan would investigate the case the following day.

{¶ 15} While the deputies were in the home, T.S. provided them with a picture from her phone of the person she knew to be "Zack." The picture was a screenshot of a video that had been uploaded on the internet that T.S was able to capture. The deputies

6.

transported T.S. and H. to the sheriff's department where each was interviewed and asked to provide a written account of what happened. The deputies did not recommend that T.S. undergo a sexual assault examination at the hospital because T.S. did not have any physical signs of injury and because the officers determined that there would be no recoverable forensic evidence based, in part, on T.S.'s report that Durst had not ejaculated. At trial, T.S. and "H." identified Durst as the person who came over that night and assaulted T.S.

{¶ 16} Detective Duncan shared the photo of Durst with other law enforcement agencies, and a detective with the Sandusky Police Department recognized Durst as a Sandusky resident. Detective Duncan then created a photo line-up that included Durst's photograph. T.S. identified Durst as her attacker, and a warrant was issued for Durst's arrest. Durst was arrested by officers with the Sandusky Police Department on July 22, 2017. At the time of the arrest, the police recovered a Samsung "Galaxy S7" cell phone in his possession.

{¶ 17} As part of the investigation, Detective Duncan consulted with Detective Dennis Papineau of the Erie County Detective's Bureau. At the time, Detective Papineau was investigating a sexual assault claim that was alleged to have occurred in Erie County. The incident was reported to his department on July 24, 2017 and involved C.B., the victim in case No. 4 (see below).

{¶ 18} Detective Papineau is well-trained in cell phone forensics and skilled at recovering deleted files, such as messages and photos. In this case, however, he could

7.

not retrieve any relevant information from the cell phone found in Durst's possession because it was password-protected. Detective Duncan subpoenaed the cell phone service provider, Sprint, and learned that the actual subscriber of the phone line attached to the phone was Ryan Jenkins. Testimony at trial established that the phone was lent to Durst by a third-party named Sandra Stahl who knew Jenkins and Durst.

{¶ 19} Detective Papineau also obtained a search warrant to send the locked phone to Cellebrite, a company in New Jersey that specializes in "deep extractions" on cell phones. Cellebrite unlocked the phone and retrieved data of all sorts, including text messages and videos. Detective Papineau received the phone back from the company, along with an external storage device that contained text messages, photographs, images, and videos from the phone. Detective Papineau created a report of data that was relevant to his investigation (in case No. 4 regarding C.B.) and also provided the report to Detective Duncan in Huron County to review for information relevant to his investigation (in case Nos. 1 and 2 regarding T.S. and A.S.).

{¶ 20} Detective Duncan identified messages between Durst and T.S. that matched her description of events, and he identified other communications between Durst and an unidentified girl, whom he suspected to be A.S. He asked T.S. and A.S. to come to the station with their parents. During that January 9, 2018 meeting, Detective Duncan asserted that, based upon the content of the communications, he thought there was a second victim and he asked them to identify a particular cell phone number. Initially, A.S. denied that she had any contact with Durst, but when her father verified that the

8.

number was hers, A.S. "began to weep," and it became "obvious" that she had been "involved with Mr. Durst." A.S. then admitted to the events described above.

{¶ 21} As to T.S., Durst was indicted on February 16, 2008 on five counts: rape, in violation of R.C 2907.02(A)(2) and (B), a felony of the first degree (Count 1); importuning, in violation of R.C. 2907.07(D)(1) and (F)(3), a felony of the fourth degree (Count 2); unlawful sexual contact with a minor, in violation of R.C. 2907.04(A) and (B)(3), a felony of the third degree (Count 3); unlawful sexual contact with a minor, in violation of R.C. 2907.04(A) and (B)(4), a felony of the second degree (Count 4); and importuning, in violation of R.C. 2907.07(B)(1) and (F)(3), a felony of the fourth degree (Count 5). The jury convicted Durst on all five counts. The trial court sentenced Durst to a mandatory sentence on Count 1, rape, of ten years and a mandatory sentence on Count 2, importuning, of one year. The court merged Counts 3 and 4 with Count 1 and merged Count 5 with Count 2.

{¶ 22} Durst was indicted on the same counts, with respect to his assault of A.S., also on February 16, 2018, i.e., rape, in violation of R.C 2907.02(A)(2) and (B), a felony of the first degree (Count 1); unlawful sexual contact with a minor, in violation of R.C. 2907.04(A) and (B)(4), a felony of the second degree (Count 2); unlawful sexual contact with a minor, in violation of R.C. 2907.04(A) and (B)(3), a felony of the third degree (Count 3); importuning, in violation of R.C. 2907.07(B)(1) and (F)(3), a felony of the fourth degree (Count 4); and importuning, in violation of R.C. 2907.07(D)(1) and (F)(3), a felony of the fourth degree (Count 5). The jury convicted Durst on Counts 2, 3, 4, and

9.

5. It found Durst not guilty as to Count 1, rape. The trial court sentenced Durst to seven years in prison as to Count 2, unlawful sexual conduct with a minor, and mandatory sentence of one year as to Count 5, importuning. It merged Count 3 with Count 2 and merged Count 4 with Count 5.

**Case No. 3 regarding victim R.L.**

{¶ 23} The state alleged that Durst assaulted R.L. on July 5, 2017—which is the same day that he assaulted A.S.

{¶ 24} R.L. testified that she first met Durst, who called himself "Mack," online, in 2016. She met him for the first time "in person" in April of 2017. At that time, Durst and R.L.'s sister were involved in a consensual sexual relationship.

{¶ 25} In May of 2017, R.L. had a very bad reaction to a flu vaccine and lost feeling beneath her waist and the ability to walk. In June, R.L. was released from the hospital and transferred to a nursing home in New London, Ohio to recover.

{¶ 26} On July 5, 2017, while still recovering at the nursing home, R.L. was contacted by Durst, who asked if she wanted to "hang out." R.L. was pleased at the chance to leave the nursing home, which was populated by mostly "elderly" people. Around 4:00 p.m., Durst arrived. R.L. testified that she and Durst signed a log at the time she left the facility, and the log was admitted as an exhibit at trial. Durst helped R.L., who was reliant on a wheelchair, to get into his car.

{¶ 27} R.L. asked to visit her sister, and Durst agreed to take her. Along the way, Durst "kept telling [R.L.] that he always wanted [her] [and kept] asking [for] a blow job."

10.

R.L. "kept telling him no." Despite that, Durst pulled the car into a drive in the middle of cornfields, somewhere in Clarksfield, Ohio. Durst said, "come on, let's do it" even though "he knew [she] couldn't feel anything." Durst then "got on top of" R.L. and "[took] off [her] pants * * * [a]nd then he just stuck his penis in [R.L.], and just had sex with [her]." Durst ejaculated. R.L. testified, "I didn't really know what to say, so I just kind of let him do it, because I didn't have the strength to kick him off." Afterward, Durst messaged R.L.'s sister to tell her that they were coming to her house.

{¶ 28} Once there, R.L. asked her sister to take her to the bathroom so she "could tell her" what happened. The sister advised R.L. that if she was "not comfortable saying anything, [then] don't say anything." Despite being afraid, R.L. allowed Durst to return her to the nursing home "[b]ecause [she] had no other ride home." The two exchanged few words on the way back, and R.L. had no contact with Durst after July 5, 2017.

{¶ 29} Initially, R.L. did not report the assault to the police. But, after R.L. learned Durst had also assaulted her friend, T.S., she changed her mind. R.L. then reported the assault to Detective Duncan in January of 2018 while both were at the Huron County Courthouse with respect to the criminal case against Durst involving T.S. and A.S.

{¶ 30} With respect to R.L., Durst was indicted on April 27, 2018 on two counts: rape, in violation of R.C. 2907.02(A)(1)(c) and (B), a felony of the first degree (Count 1) and sexual battery, in violation of R.C. 2907.03(A)(2) and (B), a felony of the third degree (Count 2). The jury convicted Durst as to Count 2, and the trial court sentenced

11.

him to serve four years in prison. The jury found Durst not guilty of rape, as set forth in Count 1.

**Case No. 4 regarding victim C.B.**

{¶ 31} The fourth and final victim to report that she had been assaulted by Durst was 16-year-old C.B. C.B. first met Durst on July 12, 2017, the same day of the assault, through a mutual friend, Kodi Schambers, who had previously met Durst in person "once or twice."[1] Schambers had spent the previous night at C.B.'s house and had been "snapchatting" with Durst during the sleepover. At 5:05 a.m., C.B. and Schambers left C.B.'s Bellevue, Ohio, home in Huron County, to walk to a nearby carryout for coffee. Durst pulled up alongside the two of them in his car. Durst, calling himself "Mack," told them to "get in the car * * * to hangout." C.B. was "concerned" about getting into the car because she did not know Durst and because she had to work in a few hours, but she "trust[ed]" Schambers, who did know him, and "figured it was okay."

{¶ 32} Within two or three minutes into their trip, Bellevue Police Officer Frank Sirse pulled Durst over for a moving violation and for having license plates that were registered to a different car. As Officer Sirse approached the car, he noticed that Durst was taping the officer from his cell phone. Segments of the video from that traffic stop were played for the jury. During the stop, Durst can be heard complaining of "police

---

[1] Schambers, who is transgendered, is the subject of Durst's second assignment of error. We refer to Schambers with female pronouns, consistent with her preference, and have altered her gender designations in the transcript, where appropriate.

12.

harassment." A second officer, Michael Wagner, arrived and addressed C.B., who was in the back of Durst's vehicle. On the tape, Office Wagner can be heard saying to C.B., "[your] mom has no idea where you're at" and wondering aloud why C.B. "got in the car with a 28 year-old." C.B. told Officer Wagner that she was familiar with the Bellevue curfew, that she was not in violation of that curfew, and that she was "done talking" to him. Durst told the officer that "[w]e were just going to the gas station. That's all we were doing." After verifying Durst's ownership of the vehicle, the police allowed them to proceed. At trial, C.B. said that she was "angry" with the police whom she thought were "trying to get [her] in trouble for no reason."

{¶ 33} After they were allowed to proceed, Durst, C.B. and Schambers "drove around" for about ninety minutes. During that time, Durst showed them videos on his phone of him having sex with women, which "disgusted" C.B. He also bragged about the size of his penis and asked them to feel how soft his boxer shorts were. Around 7:00 a.m., Durst pulled into Resthaven Wildlife, a nature preserve in Castalia, Ohio, located in Erie County. Durst parked "all the way back to where it dead ends," near a pond. The three talked for a while and drank beer that Durst provided. C.B. testified that Durst had "his hands * * * all over [her]" and repeatedly tried to get Schambers to leave the two of them alone. Durst also became physically aggressive with C.B. She testified, "[a]t one point, he did bend me over * * * while * * * fully clothed [and] thrusted his hips into mine." C.B. "kept telling [Schambers] to stay with [her]." C.B. also led them away from the car to the pond to listen to the geese. Near the pond, Durst picked C.B. up, told

Schambers to stay back, and carried C.B. to the car. C.B. told him to put her down, but Durst kept telling her to "relax." Schambers followed. Durst put C.B. into the back of the car, and "was laying on top of C.B. while he was negotiating with [Schambers]." Durst offered to buy Schambers breakfast and cigarettes if she would leave them alone. Schambers testified that she set two timers for five minutes, one she took with her and one she left in the car. She told Durst, "that's how long [you have]." Schambers did not walk too far away "just in case."

{¶ 34} After Schambers walked away, Durst tried getting C.B.'s pants off, while C.B. "kept trying to pull them back on." When C.B. heard the stitches of her pants start to rip, she "let go [because she] didn't want [her] pants to be torn," but she told him "to stop, [and] to get off" of her and that she "didn't want [her] clothes off." Durst acted "like it was a game * * * and would smile * * * like it was perfectly okay." Durst then tried to get C.B.'s underwear off, and she told him, "my underwear [isn't] coming off." Durst responded, "it's fine, I'll just move them to the side." C.B. tried to get out of the car, but he "pushed [her] back down." C.B. testified that she "froze * * * [and] saw that [she] wasn't going to win," but she was also "relying on [Schamber's] timer" and "hoping the time was going a lot faster than it was."

{¶ 35} C.B. testified that "[Durst] proceeded to put his penis in me and rape me, and he held me down." During the rape, Durst "had both his hands on [C.B.'s] wrists," and at one point he had "one hand on [her] throat." When the timer in the car went off, C.B. told Durst that Schambers would be back soon and that "he needed to get off me."

14.

According to C.B., Schambers did return and said, "time's up" and "just so, you know, there's a guy in a truck right over there." At that point, Durst "did back up and started to pull his pants up," and C.B. exited the vehicle.

{¶ 36} Within five minutes, the three left the park, and headed back toward C.B.'s home. Along the way, Durst stopped at a carry-out and at Burger King to buy the promised cigarettes and breakfast. While Durst was in the carryout, C.B. told Schambers what happened, and Schambers told her, "you know that was rape, right?" C.B. said she was "speechless" and in "shock." She was also very sore and bled for four days.

{¶ 37} In the week or so after the rape, Durst "sent about 50" Snapchat and Facebook messages a day to C.B., wanting to know what she was doing, wanting to hang out, and telling her he wanted to see her again. C.B. ignored the messages and ultimately blocked him from contacting her.

{¶ 38} Initially, C.B. told no one, besides Schambers, about the rape. Later in the month, C.B. told a friend, who encouraged her to tell her parents. While on a walk, C.B. told her mother, and together, they told C.B.'s father, who reported the rape to the Erie County Sheriff's Department on July 24, 2017. As part of the investigation, C.B. was interviewed by the Huron County Children's Services Department. She also provided the clothing she had been wearing that day to the sheriff's deputies.

{¶ 39} C.B. also reported the rape to her gynecologist in August. As "reality set in," C.B. worried that she could have caught a sexually transmitted disease from Durst, and she was also experiencing "really bad cramping." C.B.'s doctor tested her "for

15.

everything" and put her on an anti-anxiety medicine. On the day of her appointment, C.B. learned that she was pregnant but also that she was in the process of miscarrying the baby, which happened over the course of one or two days. No forensic evidence from the rape was collected, and C.B.'s claim—that she was pregnant—was not confirmed at trial.

{¶ 40} The case was assigned to Detective Papineau with the Erie County Detective's Bureau. As discussed above, Detective Papineau discovered video evidence on a cell phone that supported C.B.'s timeline of events. Specifically, he located the video of Durst filming the traffic stop by Bellevue Police and videos of Durst having sex with women (that he allegedly showed to C.B. as he drove her to the nature preserve). Detective Papineau also obtained a video from Burger King, which showed Durst in his vehicle going through the drive-through line on the day of the rape.

{¶ 41} With respect to C.B., Durst was indicted on May 25, 2018 on a single count of rape, in violation of R.C. 2907.02(A)(2) and (B), a felony of the first degree. The jury eventually convicted Durst, as charged, and the trial court sentenced him to a mandatory sentence of ten years in prison.

{¶ 42} Given that all four cases involved victims who lived in Huron County, incidents that took place over the summer of 2017, and the same critical piece of evidence, i.e., the cell phone, the cases were consolidated. At the conclusion of the trial and after various convictions and sentences were imposed, the court ordered that all sentences would run consecutively to one another, for a total of 33 years in prison. The court also placed Durst on mandatory postrelease control for five years, ordered Durst to

16.

pay $50 in restitution to C.B., and classified him as a Tier III sex offender under R.C. Chapter 2950, requiring him to register with the local county sheriff's office in person every 90 days for his lifetime and subjecting him to community notification.

{¶ 43} Durst appealed, and through his appellate counsel, he raises five assignments for error for our review:

I. The trial court erred in not granting appellant's motion for a mistrial.

II. The trial court erred in permitting the state to mischaracterize evidence.

III. The trial court erred in permitting remote testimony by a witness.

IV. The defendant's conviction is based upon insufficient evidence and his conviction is against the manifest weight of the evidence and the court erred in denying defendant's Rule 29 motion.

V. Defense counsel's performance of his duties was deficient in that he made errors so serious that he failed to function as the counsel guaranteed by the Sixth Amendment and Appellant was prejudiced by said errors. [sic]

**1. The trial court did not err in denying Durst's motion for a mistrial.**

{¶ 44} In his first assignment of error, Durst argues that the trial court erred when it denied his motion for a mistrial, which he made after the jury heard testimony regarding him selling heroin. He claims that such testimony was "highly prejudicial" and improper evidence of "other crimes, wrongs, or acts," in violation of Evid.R. 404(B).

{¶ 45} A mistrial must be declared "only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 U.S. 1066, 35 L.E.2d 425 (1973). In analyzing whether a defendant was deprived of a fair trial, "an appellate court must determine whether, absent the improper remarks, the jury would have found the appellant guilty beyond a reasonable doubt." *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317, ¶ 42 (10th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984).

{¶ 46} Review of a trial court's decision denying a motion for mistrial ordinarily falls under an abuse of discretion standard. *State v. Rossbach*, 6th Dist. Lucas No. L-09-1300, 2011-Ohio-281, ¶ 39, citing *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). "Abuse of discretion" means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

18.

{¶ 47} When a defendant moves for a mistrial on the basis of improper testimony related to "other crimes, wrongs, or acts" under Evid.R. 404(B), a trial court does not abuse its discretion by denying the motion if the reference to other acts was brief and isolated, the remarks were followed by a curative instruction, and the likelihood of prejudice is low. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 174-175, citing *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) (Affirming the denial of a mistrial because "the reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction.").

{¶ 48} In this case, the reference to "prior bad acts" occurred under direct examination by the state of R.L, the victim in case No. 3, while the state was establishing when R.L. first met Durst "in person." The record indicates that the reference was brief and isolated:

> Q. And, you go to this hotel, what happens?
>
> A. We hangout at the hotel.
>
> Q. And, what, besides hanging out – what do you mean "hangout", what do you do?
>
> A. He starts becoming sexual with my sister.
>
> Q. And what happens then?
>
> A. When we were about to leave, my sister had to use the bathroom, and he was selling heroin or something.
>
> [Durst's Counsel]: Objection

{¶ 49} After a sidebar conference and a break for Durst to consult privately with his counsel, Durst requested a mistrial or, alternatively, a curative instruction from the court. The court denied the requested mistrial but instructed the jury to "disregard the last question answer [sic], to not consider them for any purpose in your deliberations. They are not related to this case."

{¶ 50} We find it unlikely that a single, errant comment regarding Durst selling drugs had any impact on the outcome of the trial. Moreover, defense counsel promptly objected, the objection was sustained, and the jury was instructed to disregard the testimony. We must presume that the jury followed the trial court's instructions. *See State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994). For these reasons, we find that the trial court did not abuse its discretion by denying Durst's motion for a mistrial, and his first assignment of error is found not well-taken.

## II. Durst was not prejudiced by the prosecutor's forecast of what the evidence would show during opening statements, which proved to be inaccurate.

{¶ 51} In his second assignment of error, Durst complains that he was prejudiced and prevented from having a fair trial because the state mischaracterized evidence relating to case No. 4 (involving victim C.B.) during its opening statement.

{¶ 52} Because defense counsel did not object to the prosecutor's opening statement, we must review for plain error only. In order to prevail on a claim governed by the plain error standard, Durst must demonstrate that the outcome of his trial would clearly have been different, but for the prosecutor's statements. *See State v. Waddell*, 75

20.

Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996). Notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 53} During the opening statement, the prosecutor stated that before C.B.'s rape, Schambers left Durst and C.B. alone in the back seat of Durst's car, and promised to return in five minutes. The prosecutor then stated:

> And when [Schambers returns], [she] can see that the defendant is having - - he's having sex with [C.B.] in the back seat of the car.
>
> [Schambers] goes around to the back, because the defendant doesn't stop. *[She] goes around to the back of the car and grabs the defendant and pulls him backwards and said, You need to stop.* We need to go home. There's another car coming. And there was. Somebody else was arriving. With that the rape ends. (Vol. I, Opening Statement at 248; emphasis added).

{¶ 54} The prosecutor's statement, however, did not match Schambers' testimony on that point. Schambers testified that, when she returned to the car and observed Durst on top of C.B., she, i.e., Schambers, "didn't touch him, but * * * told him to get off of her." The point was made again during re-cross examination:

Q. Ms. Schambers, you say you didn't physically intervene when you returned and found them in that position? * * *

A. No.

Q. Okay. You didn't grab [Durst] from, like, the back of his shirt and try to physically pull him off?

A. Not that I can recall.

Q. If somebody else testified to that, they're wrong.

A. I didn't say that.

{¶ 55} Although the state acknowledges that the prosecutor's assertion during opening statements was not a fair characterization of the evidence, it argues that the prosecutor's overstatement did not prejudice Durst. We agree.

{¶ 56} Before opening statements began, the trial court properly instructed the jury that opening statements were not evidence, but were merely a "preview" of what each side believed the evidence would show. *See, e.g., State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). We find that the instruction, combined with Schambers' clear testimony—that she had no physical contact with Durst—cured any overstatement by the prosecutor. *Accord State v. Morgan,* 2d Dist. Montgomery No. 19416, 2004-Ohio-461, ¶ 41 (Overstatement by prosecutor that hair sample was an "identical" match to the defendant was not prejudicial where court instructed jury that opening statements were not evidence and where crime lab technician disputed that hair sample was

identical.).   Moreover, whether Schambers made any physical contact with Durst is irrelevant to the state's rape case against him.

{¶ 57} We, therefore, find no plain error, and Durst's second assignment of error is not well-taken.

### III.  Although the state failed to establish the necessity of calling a witness remotely, any error in allowing him to testify was harmless.

{¶ 58} In his third assignment of error, Durst claims that the trial court violated his constitutional right to confrontation when it permitted Brian Stofik, a Cellebrite techno-forensic specialist who searched Durst's cell phone, to testify remotely.  Stofik appeared at trial as a live witness, by video link, from Parsippany, New Jersey, where Cellebrite is located.

{¶ 59} Stofik testified that he unlocked the cell phone, extracted data from it, and then duplicated and transferred the data to a password-protected external drive.  Stofic did not, however, review the contents of the data.  Stofik also testified as to the processes used by Cellebrite to ensure the integrity of the data and to protect the phone while it was transported between Ohio and New Jersey.

{¶ 60} At trial, Durst argued that allowing Stofik to testify remotely would deprive him of his constitutional right to confront Stofik "face-to-face."  The trial court allowed the witness to testify but advised that, "[going] forward" if Durst had "particularized concerns" about the witness's testimony, the matter could be revisited.  No further objection was made.

23.

{¶ 61} A criminal defendant has a right to confront witnesses under both the federal and Ohio constitutions. The Sixth Amendment to the United States Constitution provides, "[i]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him." In addition, Article I, Section 10 of the Ohio Constitution states that, "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *." While the Ohio Constitution provides its own right of confrontation, that right is no broader than that created under federal law. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12.

{¶ 62} A defendant's right of confrontation consists of four "elements": the witness's "physical presence" in court; (2) the witness's testimony under oath, which impresses upon the witness "the seriousness of the matter and guard[s] against the lie by the possibility of a penalty for perjury;" (3) the witness being subjected to cross-examination, "the greatest legal engine ever invented for the discovery of the truth;" and (4) providing the factfinder with the ability "to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing [the witness's] credibility." (Citations omitted.) *Maryland v. Craig*, 497 U.S. 836, 845-846, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Although "the Confrontation Clause reflects a preference for face-to-face confrontation at trial," that "preference must occasionally give way to considerations of public policy and the necessities of the case." *Id.* at 849; s*ee also State v. Self*, 56 Ohio St.3d 73, 564 N.E.2d 446 (1990) ("[L]iteral face-to-face confrontation is

24.

not the sine qua non of the confrontation right." Rather, "its underlying value is grounded upon the opportunity to observe and to cross-examine.").

{¶ 63} To qualify as an exception to the face-to-face confrontation requirement, the procedure must "(1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation — oath, cross-examination, and observation of the witness's demeanor." *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, ¶ 18, quoting *Harrell v. State*, 709 So.2d 1364, 1369 (Fla.1998), citing *Craig* at 849-851.

{¶ 64} Here, Durst argues that the state failed to establish that Stofik's absence from court was "justified." That is, the state did not demonstrate that Stofik was somehow prevented from testifying in person and therefore "unavailable."

{¶ 65} This same issue was addressed in *State v. Oliver*, 8th Dist. Cuyahoga No. 106305, 2018-Ohio-3667. In that case, the record indicated that the witness to a physical assault (that occurred in Ohio) was unemployed and living in Florida. The court of appeals found that the witness should not have been allowed to testify via "Skype" because the "unavailability threshold was not met." The court found that mere "inconvenience[]" to the witness, standing alone, "is an insufficient justification" to excuse the witness from testifying in person. *Id.* at ¶ 24; *see also State v. Sheline*, 8th Dist. Cuyahoga No. 196649, 2019-Ohio-528 (witness who was in California at time of trial was deemed unavailable where state "attempted" but was "unsuccessful" at making arrangements to fly her back for trial).

25.

{¶ 66} Similarly here, we find that Stofik should not have been permitted to testify remotely because the state did not establish that his absence was "justified," i.e., that he was unavailable to appear in person. But, in this case, we find that this was harmless error under Crim.R. 52(A). ("[A]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.").

{¶ 67} To find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State v. Lytle*, 48 Ohio St.2d 391, 403, 358 N.E.2d 623 (1976). A reviewing court may overlook an error where the remaining admissible evidence, standing alone, constitutes "overwhelming" proof of a defendant's guilt. *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983).

{¶ 68} Here, Durst does not raise any concerns about the actual substance of Stofik's testimony, nor does he challenge the admissibility of the cell phone, the data downloaded from the phone, or the chain of custody of the phone once it was confiscated. Moreover, Stofik prepared a "witness statement," which mirrored his testimony at trial and which was admitted without objection as state's exhibit No. 8. Given that Durst does not challenge the admissibility of these items, we find that the admission of Stofik's testimony—without a preliminary showing of unavailability by the state—was harmless error. *Accord Oliver* at ¶ 25 (Testimony via Skype was cumulative of other witness's live testimony and therefore harmless). We therefore find that Durst's third assignment of error is not well-taken.

26.

## IV. The convictions are supported by the sufficiency and weight of the evidence.

{¶ 69} In his fourth assignment of error, Durst claims that "there is insufficient evidence to sustain a conviction, [that] the conviction is against the manifest weight of the evidence and [that] the Court erred in failing to grant the Rule 29 Motion to Acquit."

Under the Rules of Appellate Procedure, an appellant must establish each assigned error through an argument supported by citations to legal authorities and facts in the record. App.R. 16(A)(7). If an appellant fails to advance such an argument, a court of appeals may disregard the assignment of error. App.R. 12(A)(2). In other words, appellate courts "are not obligated to search the record or formulate legal arguments on behalf of the parties, because appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them." (Citations omitted). *Risner v. Ohio Dep't of Nat. Res., Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28.

{¶ 70} Durst fails to make any specific arguments in support of this assignment of error. Indeed, he does not even mention the facts of his case, much less identify what evidence is lacking.

{¶ 71} Accordingly, pursuant to App. R. 12(A)(2), we find Durst's fourth assignment of error not well-taken.

27.

## V.  Durst received effective assistance of trial counsel.

{¶ 72} In his final assignment of error, Durst claims that he received ineffective assistance of trial counsel.  To establish his claim, Durst must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different."  *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 200, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 73} A reviewing court must determine whether trial counsel's assistance fell below an objective standard of reasonable advocacy.  *Bradley* at 141-142.  Moreover, the deficient performance must have been so serious that, "were it not for counsel's errors, the result of the trial would have been different."  *Id.* at 141-142.

{¶ 74} Generally, defense counsel's trial tactics and strategies do not constitute ineffective assistance.  *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980), citing *Lytle*, 48 Ohio at 396, 358 N.E.2d 623. Trial strategy "must be accorded deference and cannot be examined through the distorting effect of hindsight."  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 115.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Strickland* at 691.

**{¶ 75}** Durst faults his trial counsel for failing "to present witnesses provided to him by [Durst] and failing "to submit exhibits presented to him by [Durst]." "[C]ounsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). Further, Durst fails to identify the witnesses he would have called and the evidence he would have offered, much less explain how counsel's failure to proffer them prejudiced him.

**{¶ 76}** Durst also complains that his counsel failed to call him as a witness, which deprived him of the opportunity to tell "his side of the story." The record establishes that Durst was advised of his right to testify in his own defense and that he waived that right.[2] At the close of the state's case-in-chief, defense counsel told the court, outside the presence of the jury, that he and Durst had discussed whether Durst would testify in his own defense and that they were "going to talk about [it] again very briefly" before making a decision. After a recess, Durst confirmed that he understood he could testify if he wished to, that he had discussed the risks and rewards of testifying with his lawyer, and that, based on those risks and rewards, he had decided not to testify. The decision of whether to have the defendant testify is a "tactical decision" that remains within the purview of trial strategy. *State v. Carpenter*, 6th Dist. No. E-00-033, 2002-Ohio-2266,

---

[2] Durst does not attack the legitimacy of his waiver of his right to testify.

¶ 68, citing *id.,* quoting *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

{¶ 77} For these reasons, we find that trial counsel's performance was neither deficient nor prejudicial, and Durst's fifth assignment of error is not well-taken.

**Conclusion**

{¶ 78} Based on the foregoing, the September 6, 2018 judgments of the Huron County Court of Common Pleas are affirmed. Durst is ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.