**[Cite as *State v. Castonguay*, 2021-Ohio-3116.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-2 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-119 |
| | : | |
| COREY D. CASTONGUAY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of September, 2021.

. . . . . . . . . . .

DEBORAH S. QUIGLEY, Atty. Reg. No. 0055455, Darke County Prosecutor's Office, 504 South Broadway Street, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

ALEXANDER S. PENDL, Atty. Reg. No. 0093792, 121 West Third Street, Greenville, Ohio 45331
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Corey D. Castonguay appeals from his convictions for the following offenses: Count I, grand theft, in violation of R.C. 2913.02(A)(3), a felony of the third degree; and Count II, misuse of a credit card, in violation of R.C. 2913.21(B)(2), a felony of the fourth degree. Castonguay filed a timely notice of appeal on January 27, 2021.

{¶ 2} The record establishes that in March 2020, the victim, 72-year-old David Paxson, resided with his wife in Versailles, Ohio, located in Darke County. Paxson maintained bank accounts with Wright-Patt Credit Union (WPCU). Paxson had been a member of WPCU since 1985, and the accounts were in his and his wife's names. Paxson generally banked with WPCU online because it did not have any physical locations in Darke County.

{¶ 3} Paxson testified that on either March 18 or 19, 2020, he accessed his WPCU accounts online and found that someone had transferred $4,000 from his savings account into the account of Castonguay. Paxson testified that he did not know Castonguay. Paxson immediately called the WPCU Fraud Department and the Darke County Sheriff's Department to report the theft of his money.

{¶ 4} Paxson testified that, the following day, he again accessed his WPCU accounts online and discovered that over $8,000 had been transferred from his credit card to Castonguay. Paxson again contacted the WPCU Fraud Department. Paxson and his wife, Beverly, both testified that they did not know Castonguay and at no time did they transfer or authorize a transfer of money to Castonguay from their WPCU credit card or savings account on March 18, 2020.

**{¶ 5}** The evidence adduced at trial established that on March 18, 2020, Castonguay traveled to the Wright Dunbar branch of WPCU on Third Street in Dayton, Ohio, and opened an account. WPCU associate Megan Kammer testified that she helped Castonguay open the account with $10 in cash, of which he deposited $5 into the new account. The majority of the transaction, which occurred at approximately 12:30 p.m., was recorded by security cameras inside the credit union. Notably, in the security footage presented at trial, no one was wearing a mask.

**{¶ 6}** Later the same day, an individual claiming to be Paxson contacted the WPCU call center at approximately 4:13 p.m. and spoke with Sandra Goodchild, another WPCU associate. The call was recorded. Goodchild testified that, as part of WPCU protocol, she asked the caller questions regarding Paxson's identity and account information in order to verify with whom she was speaking. Goodchild testified that, after she believed that she had properly verified the caller's identity, she authorized a transfer of $8,786 from Paxson's WPCU credit card to Castonguay's newly opened WPCU account. Significantly, Goodchild testified that the caller claiming to be Paxson did not provide a credit card number, and Goodchild did not ask for that information. Goodchild testified that she generated a receipt for the transaction. Upon listening to the recording of the conversation, Paxson testified that the information provided by the caller to Goodchild was incorrect, and that he did not make the call authorizing the transfer of funds from his credit card to Castonguay's account.

**{¶ 7}** At trial, the State introduced its Exhibit 5, which was bank surveillance footage depicting a transaction initiated by Castonguay on March 18, 2020, at the Northwest WPCU branch located in Englewood, Ohio. Specifically, the surveillance

footage depicted Castonguay making a withdrawal of $8,700 from his newly opened WPCU account.   The receipt for the withdrawal established that the transaction occurred at 4:26 p.m. on March 18, 2020.

{¶ 8} Christian Anderson, an associate at the WPCU Beavercreek call center, testified that on March 18, 2020, he was contacted by an individual claiming to be Paxson at approximately 6:04 p.m.   The call was recorded.   Anderson testified that the individual stated that he wanted to transfer funds from his WPCU savings account.   Like Goodchild, Anderson testified that he asked the caller questions regarding Paxson's identity and account information in order to verify with whom he was speaking.   Anderson testified that the caller appeared confused.   Although Anderson testified that he did not recall whether he properly verified the information provided by the caller, he nevertheless authorized a transfer of $4,000 from Paxson's savings account into Castonguay's new account.   Again, upon hearing the recording of the conversation, Paxson testified that the information provided by the caller to Anderson was incorrect and that he did not make the call authorizing the transfer of funds from his WPCU savings account to Castonguay's account.

{¶ 9} Javan McCarty, an associate at the WPCU Woodman Center-Kettering branch, testified that on March 18, 2020, Castonguay entered the branch at approximately 6:08 p.m. and initiated a transaction which was recorded by security cameras inside the credit union.   McCarty testified that Castonguay withdrew $2,500 from his new account and exchanged coins for $21 in cash.   McCarty testified that Castonguay provided his identification in order to verify his identity.

{¶ 10} The final transaction conducted by Castonguay occurred at approximately

6:41 p.m. at the Cross-Pointe WPCU branch. The transaction was recorded by security cameras, and a receipt of the transaction was generated by WPCU. In this transaction, Castonguay requested and received a certified cashier's check in the amount of $1,500, with the payee being someone named Morgan Butler. In this instance, WPCU put a stop payment order on the cashier's check, and no one ever attempted to cash it.

{¶ 11} Darke County Sheriff's Deputy Mark Garbig obtained all of the WPCU surveillance footage of the transactions conducted by Castonguay on March 18, 2020. Deputy Garbig testified that he was able to verify Castonguay's identity by matching the information he provided when he opened his WPCU account and his image from the surveillance footage with his driver's license.

{¶ 12} On July 23, 2020, Castonguay was indicted for one count of grand theft, in violation of R.C. 2913.02(A)(3), a felony of the fourth degree, and one count of misuse of a credit card, in violation of R.C. 2913.21(B), also a felony of the fourth degree. However, on September 24, 2020, the State filed an amended indictment charging Castonguay with grand theft, in violation of R.C. 2913.02(A)(3), a felony of the third degree (the victim being an elderly person) and misuse of a credit card, in violation of R.C. 2913.21(B)(2), a felony of the third degree (the victim being an elderly person).

{¶ 13} On January 21, 2021, the State filed a notice of intent to provide witness testimony via live video conferencing, citing the Covid-19 pandemic and the need to protect the public. Notably, all the witnesses that were mentioned in the State's notice of intent were located outside of Darke County. On January 22, 2021, the trial court granted the State's motion to allow out-of-town witnesses to testify through video conferencing.

{¶ 14} On January 25, 2021, a bench trial was conducted. At the outset of the trial, an oral motion was made by the State to amend the amended indictment in order to reduce count 2, misuse of a credit card, to a felony of the fourth degree. The trial court granted the amendment. At the close of evidence, Castonguay orally moved for acquittal pursuant to Crim.R. 29, citing venue. On January 26, 2021, the trial court issued a brief entry overruling Castonguay's Crim.R. 29 motion. On the same day, the trial court issued a judgment entry of conviction in which it found Castonguay guilty of the charged offenses. The trial court merged the convictions for sentencing, and the State elected to proceed on Count I, grand theft, a felony of the third degree. The trial court sentenced Castonguay to 12 months in prison.

{¶ 15} Castonguay now appeals.

{¶ 16} Castonguay's first assignment of error is as follows:

THE TRIAL COURT ERRED BY DENYING APPELLANT'S CRIMINAL RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL.

{¶ 17} Castonguay contends that the trial court erred when it overruled his Crim.R. 29 motion for acquittal based upon venue. Specifically, Castonguay argues that venue in Darke County was improper because "not a single element of the charged offenses was committed by Appellant in Darke County." Appellant's Brief p. 5.

{¶ 18} Pursuant to Article I, Section 10 of the Ohio Constitution and R.C. 2901.12, "evidence of proper venue must be presented in order to sustain a conviction for an offense." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 20. "It is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt,

that the crime was committed in the county and state as alleged in the indictment." *Id.* at ¶ 19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. Circumstantial evidence may be used to establish venue. *State v. Brown*, 2017-Ohio-8416, 99 N.E.3d 1135, ¶ 33 (2d Dist.), citing *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 24 (8th Dist.).

{¶ 19} A challenge to venue raised through a Crim.R. 29 motion for a judgment of acquittal preserves for appeal the issue of the sufficiency of the evidence regarding venue. *See State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464, ¶ 23.

{¶ 20} Ohio's venue statute provides that the trial of a criminal case "shall be held in a court having jurisdiction of the subject matter, and * * * in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A). R.C. 2901.12(C) states:

(C) When the offense involved the unlawful taking or receiving of property or the unlawful taking or enticing of another, the offender may be tried in any jurisdiction from which or into which the property or victim was taken, received, or enticed.

{¶ 21} The statute further provides as follows:

(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

R.C. 2901.12(H).

{¶ 22} Finally, R.C. 2901.12(I) states:

(I)(1)   When the offense involves a computer, computer system, computer network, telecommunication, telecommunications device, telecommunications service, or information service, the offender may be tried in any jurisdiction containing any location of the computer, computer system, or computer network of the victim of the offense, in any jurisdiction from which or into which, as part of the offense, any writing, data, or image is disseminated or transmitted by means of a computer, computer system, computer network, telecommunication, telecommunications device, telecommunications service, or information service, or in any jurisdiction in which the alleged offender commits any activity that is an essential part of the offense.

(2) As used in this section, "computer," "computer system," "computer network," "information service," "telecommunication," "telecommunications device," "telecommunications service," "data," and "writing" have the same meanings as in section 2913.01 of the Revised Code.

{¶ 23} As previously stated, Castonguay argues that venue in Darke County was improper because he did not commit any element of the charged offenses in Darke County. In support of his argument, Castonguay cites to our decision in *State v. Moore*, 2d Dist. Montgomery No. 24957, 2012-Ohio-3604, wherein the defendant wrote two checks from an escrow account from her title company to purchase a residence she had been renting from her landlord; however, the money in the escrow account was not hers, but rather that of her client. The defendant's title company was located in Warren County. We found that venue in Montgomery County was proper because the defendant presented the two checks to her landlord at a public library located in Montgomery County, and the landlord deposited the checks at a bank also located in Montgomery County.

{¶ 24} In support of his argument, Castonguay also cites to *State v. Cannon*, 11th Dist. Lake No. 98-L-032, 1999 WL 476111 (June 30, 1999), wherein the court held that venue was proper in a theft case involving forged checks. In *Cannon*, the defendant deposited a forged check at an ATM located in Cuyahoga County, but the money was eventually deposited in her personal account at a bank located in Lake County. Relying on R.C. 2901.12(I)(1), the *Cannon* court held that venue was proper in Lake County. Notably, the *Cannon* court stated:

However, *the legislature has more recently enacted R.C. 2901.12(I)(1), which provides that when the offense involves a computer, computer*

*system, or computer network, the offender may be tried in any venue containing any location of the computer, computer system, or computer network of the victim. This statute was enacted, in part, to simplify various complex venue situations produced by the proliferation of computer networks. Unlike 1882, when Lindsey was decided, today's banking industry allows for a customer to access her account from almost any location on the globe.* Appellant's bank account was located in Painesville. Depositing the forged check into an ATM machine in Cleveland had the same effect as presenting the check to a teller at her bank in Painesville.

(Emphasis added.) *Id.* at *6.

{¶ 25} Castonguay next cites to *State v. Clapp*, 12th Dist. Fayette No. CA87-01-001, 1987 WL 13712 (June 29, 1987), wherein the appellate court found that the trial court erred when it denied defendant's Crim.R. 29 motion for acquittal because the State failed to prove venue. In *Clapp*, the defendant traveled out of Fayette County into Mahoning County in his employer's truck with his employer's consent. After driving to Mahoning County, the defendant lost contact with his employer, and the truck was recovered weeks later in Virginia. The *Clapp* court found that the defendant did not develop a purpose to steal the truck until he arrived in Mahoning County. Thus, *Clapp* held that Fayette County was not the proper venue, and the trial court should have granted defendant's Crim.R. 29 motion for acquittal.

{¶ 26} Lastly, Castonguay cites *State v. King*, 10th Dist. Franklin Nos. 88AP-665, 88AP-1082, 1989 WL 83577 (July 18, 1989). In *King*, a codefendant obtained a check for $10,000 from a state official at a restaurant in Cuyahoga County. The codefendant

then deposited the check into a checking account in a bank in Lake County and wrote checks to the defendant and two other individuals. The defendant took all three checks, and while in Lake County, endorsed one of the checks in another individual's name before giving the checks to another individual to cash. The defendant was later found guilty of forgery by a trial court located in Franklin County. Ultimately, the *King* court reversed the defendant's conviction for forgery, holding that the fact that the $10,000 check originated in Franklin County was insufficient to establish that Franklin County was the proper venue over the offense committed by defendant in Lake County.

{¶ 27} Here, we find that the holdings in *Clapp* and *King* cited by Castonguay are distinguishable from the instant case, as neither case involved multi-jurisdictional electronic fund transfers or computer online access to electronically-stored financial records. Recently, the Tenth District stated as follows:

> "R.C. 2901.12(G) and (H) are statutory reflections of the modern mobility of criminals to perform unlawful deeds over vast geographical boundaries." *State v. Draggo*, 65 Ohio St.2d 88, 90, 418 N.E.2d 1343 (1981). Consistent with this multi-county venue, "a grand jury of one county has authority to indict on offenses occurring in other counties provided that those offenses are part of a course of criminal conduct." *State v. Ahmed*, 8th Dist. No. 84220, 2005-Ohio-2999, ¶ 11.

*State v. Armengau*, 10th Dist. Franklin No. 18AP-276, 2019-Ohio-1010, ¶ 14.

{¶ 28} The offenses committed by Castonguay were committed "as part of the same transaction or chain of events, or in furtherance of the same purpose or objective," namely to deprive Paxson and his wife of funds contained in their electronically-stored

bank accounts at WPCU. *See* R.C. 2901.12(H)(3) and (I)(1). We agree with the trial court's finding that, while money from bank accounts is traditionally physically stored at a bank branch, the Paxsons' electronic property (money) was also located at their residence in Darke County based upon their ability to access it by computer and telephone. Therefore, Castonguay's course of conduct included that Paxson resided in Darke County. Essentially, modern online access to electronic financial records "makes a home computer equal in function to a traditional bank physical branch bank location." Trial Court Decision (Jan. 26, 2021), p. 2.

{¶ 29} We agree with the trial court that Castonguay's conduct in depriving the Paxsons of their electronically-stored money occurred in Montgomery County when it was "physically transferred in paper currency" to Castonguay and also when the electronic funds were transferred from the Paxsons' WPCU account and credit card to Castonguay's account. Additionally, Castonguay's offenses also occurred in Darke County when the Paxsons' were deprived of the use of their electronically-stored property (money). Specifically, on March 19, 2020, Paxson was deprived of his electronically-stored funds in Darke County when he accessed his accounts and discovered that a significant amount of his money had been withdrawn from his savings account and credit card without his consent. As previously stated, pursuant to R.C. 2901.12(I)(1), when the offense involves a computer, computer system, or computer network, the offender may be tried in any venue containing any location of the computer, computer system, or computer network of the victim.

{¶ 30} Accordingly, the trial court correctly found that venue was proper in Darke County and that the conduct of Castonguay represented the type of "modern mobility of

criminals to perform unlawful deeds over vast geographical boundaries." *See Draggo*, 65 Ohio St.2d at 90, 418 N.E.2d 1343. In light of the foregoing, we find that the trial court did not err when it overruled Castonguay's Crim.R. 29 motion for acquittal based upon venue.

{¶ 31} Castonguay's first assignment of error is overruled.

{¶ 32} Castonguay's second assignment of error is as follows:

THE TRIAL COURT ERRED BY PERMITTING THE STATE'S WITNESSES TO TESTIFY REMOTELY IN VIOLATION OF APPELLANT'S RIGHT TO CONFRONT WITNESSES AGAINST HIM PURSUANT TO THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 33} Castonguay argues that the trial court erred when it permitted three of the State's witnesses to testify remotely without a proper showing of necessity, thereby violating his right to confrontation.

{¶ 34} The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, affords criminal defendants the right "to be confronted with the witnesses against" them. *Maryland v. Craig*, 497 U.S. 836, 844, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). While "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' " "the face-to-face confrontation requirement is not absolute." (Citation omitted.) *Id.* at 847, 850. Rather, " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial[ ]' * * * that 'must occasionally give way to considerations of public policy and the necessities of the case[.]' " (Citations omitted.) (Emphasis sic.) *Id.* at 849. "The requisite finding of necessity must of course be a case-specific one," based on evidence presented to the

trial court. *Id.* at 855.

**{¶ 35}** In *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, the appellate court determined that the use of a live video link to allow a key prosecution witness to testify from Belgium did not violate the defendant's confrontation right. *Id.* at ¶ 22. The court set forth the following test for determining whether an alternative to face-to-face confrontation qualifies as an exception to the Confrontation Clause:

> [T]he procedure must (1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation – oath, cross-examination, and observation of the witness's demeanor.

*Id.* at ¶ 18, citing *Craig* at 849-851.

**{¶ 36}** The *Marcinick* court reasoned that the State had "demonstrated the unavailability of the witness and the admissibility of the testimony," and that "[t]he live two-way link preserved the reliability elements of confrontation: the witness testified under oath; was subject to cross-examination; and, the trial court and [the defendant] could observe the witness' demeanor while testifying." *Id.* The court thus determined that the trial court did not err by admitting the remote testimony. *Id.*

**{¶ 37}** In support of his argument that he was denied his right to confront three of the State's witnesses who were permitted to testify remotely, Castonguay cites *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573 (8th Dist.). In *Oliver*, the appellate court concluded that the trial court erred by allowing a witness residing in Florida to testify by Skype, because that witness "was not unavailable," but merely would be "inconvenienced" if she were required to travel to Ohio to personally appear at trial. *Id.*

at ¶ 24.   In distinguishing *Oliver*, we recently stated:

> The facts here are readily distinguishable; [the remotely testifying witness'] circumstances presented a matter not of simple convenience, but of potentially serious health consequences.   [He had "multiple medical conditions that impeded his ability to travel."]   Furthermore, in *Oliver*, the same appellate court concluded that the trial court was justified in permitting a different witness to testify remotely from Kentucky, as that witness was caring for her husband who was undergoing dialysis following a liver transplant. *Id.* at ¶ 22.   The trial court did not err by concluding that permitting [the witness] to testify remotely was justified.

*State v. Howard,* 2020-Ohio-3819, 156 N.E.3d 433, ¶ 59.

**{¶ 38}** In the trial court's decision permitting the State's witnesses to testify remotely, it stated the following:

> 4. Proposed changes to the Ohio Rules of Criminal Procedure currently published for public comment explicitly allow testimony by contemporaneous audio/video methods.   The frequency of use of remote methods was accelerated by the 2020 Covid-19 conundrum [and] has demonstrated both the need for such methods as well as the efficacy of such methods. * * *
>
> 5. Since 2001, this Court has used the remote contemporaneous audio/video method and the Court takes notice of the practical efficacy and economic benefits of such method.

Judgment Entry (Jan. 22, 2021), p. 2.

{¶ 39} The three State's witnesses whose remote testimony Castonguay objected to were Kammer, McCarty, and Brendon Allen.   All three witnesses lived and worked outside of Darke County, where Castonguay's trial was held.   None of the witnesses had had any health problems that made it difficult or impossible to attend the trial and testify in person.   Castonguay argues that under these circumstances, the witnesses were merely inconvenienced and that was an insufficient basis upon which to allow the witnesses to testify remotely.   However, as noted by the trial court, the effect of the Covid-19 "conundrum" has served to make it a matter of public policy and health concerns to allow witnesses to testify remotely.   Furthermore, the State argued that it made the request for the three witnesses to testify remotely, in part, because of its concerns regarding the pandemic and the need for the health and safety of the public.

{¶ 40} Additionally, the record clearly establishes that the trial court complied with the requirements set forth in *Marcinick* and repeated in *Howard*.   Specifically, Kammer, McCarty, and Allen testified under oath, Castonguay, opposing counsel, and the trial court could each observe the witnesses as they testified remotely, and each of the witnesses was subjected to cross-examination.   Upon reviewing the transcript, it appears there was only one instance when the video feed froze during Kammer's remote testimony, and the issue was resolved quickly without incident.   The transcript reveals no further glitches with the video feed.

{¶ 41} In light of the record before us, therefore, even if we were to find that the trial court erred in allowing the witnesses to testify remotely because the State did not sufficiently justify the witnesses' unavailability, we note that a confrontation clause error does not require an automatic reversal.   "A constitutional error can be held harmless if

we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether a Sixth Amendment error is harmless beyond a reasonable doubt depends on "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Conway* at ¶ 78, citing *Chapman* at 23. The record establishes that the trial court here took precautions to ensure that the remote testimony did not violate Castonguay's right to confrontation. Having thoroughly reviewed the record, we cannot say there is a reasonable possibility that the remote nature of the three witnesses' testimony contributed to Castonguay's conviction. Even if the State did not sufficiently justify the witnesses' testifying remotely, we find the trial court's admission of the witnesses' remote testimony harmless beyond a reasonable doubt. *Accord State v. Durst*, 6th Dist. Huron No. H-18-019, 2020-Ohio-607 (while a witness should not have been permitted to testify remotely because the State did not establish that he was unavailable to appear in person, the admission of the remote testimony without a preliminary showing of unavailability was harmless error).

{¶ 42} Castonguay's second assignment of error is overruled.

{¶ 43} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and EPLEY, J., concur.


Copies sent to:

Deborah S. Quigley
Alexander S. Pendl

Hon. Jonathan P. Hein