[Cite as *State v. Stefanko*, 2022-Ohio-2569.]

STATE OF OHIO        )            IN THE COURT OF APPEALS
                        )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

STATE OF OHIO                   C.A. No.     30079

     Appellee

     v.                            APPEAL FROM JUDGMENT
                                 ENTERED IN THE
ERICA STEFANKO             COURT OF COMMON PLEAS
                                 COUNTY OF SUMMIT, OHIO
     Appellant              CASE No.    CR 12 07 1887(B)

DECISION AND JOURNAL ENTRY

Dated: July 27, 2022

CALLAHAN, Judge.

**{¶1}** Appellant, Erica Stefanko, appeals her convictions by the Summit County Court of Common Pleas. This Court reverses.

I.

**{¶2}** Just before midnight on June 20, 2012, a woman who identified herself as "Jen" ordered a pizza from the Domino's Pizza in Portage Lakes Plaza with instructions for delivery to the rear entrance of a business on West Turkeyfoot Lake Road. A.B., the delivery driver, did not return as expected, and the Domino's manager contacted the police. When they arrived at the address specified for the delivery, they found that it was "pitch black" and noted signs of a struggle and a significant amount of blood in the parking lot. The parking lot was otherwise empty; neither A.B. nor her vehicle were found. The New Franklin Police Department issued an alert for law enforcement to be on the lookout for A.B. and her vehicle. In the meantime, the Domino's

manager informed the police that A.B. had recently been embroiled in a custody dispute with her former boyfriend, Chad Cobb, and his then-wife, Ms. Stefanko.

{¶3}   That information led the police to an address on Rex Lake Road, a property owned by Mr. Cobb's grandparents.  Upon arrival, one officer noted the presence of an unattached garage at the rear of the property.  The officer approached the garage on foot and discovered a black Lincoln Navigator parked behind the garage.  The vehicle matched the description of a vehicle owned by Mr. Cobb's family, and when the officer approached, he found Ms. Stefanko seated in the passenger seat of the vehicle with four young children in the back.  The driver's seat was empty, and Mr. Cobb was not present.  The officer heard "heavy footsteps[]" in the woods and, after other officers arrived at the scene, proceeded into the woods and found Mr. Cobb crouched behind a tree.  Mr. Cobb was taken into custody; Ms. Stefanko was taken to the New Franklin Police Department, then released.  The four children were left in the custody of Mr. Cobb's grandparents.  Police still, however, had no information about the whereabouts of A.B.

{¶4}   Later that morning, a resident of Doylestown noticed a red light that appeared to be flashing in the area of a field of planted corn near her residence.  She noted that the light remained later in the day and called the Wayne County Sheriff's Office out of concern that there did not appear to be anyone working or moving about in the area.  A sheriff's deputy who was dispatched in response to her call approached the location on foot along an ATV trail.  The deputy received a dispatch containing a description of A.B.'s vehicle while en route to the area, and, when he emerged from a tree line into the cornfield, he noticed a vehicle that matched the description.  Upon approaching the vehicle, the deputy discovered a body in the backseat.  He noted that the individual's face was "very dark purple[]" and that a zip tie was secured around her neck.  A zip tie also bound her wrists, and wires from a device similar to a Taser hung from her body.  Pieces

of black duct tape were found on and around the body. The individual wore a Domino's shirt, and there was blood in the car. The car's license plate matched that of the car driven by A.B.

{¶5} Police later executed a search warrant at the home shared by Mr. Cobb and Ms. Stefanko. On and around an improvised table in the backyard, they discovered zip ties, items of camouflage clothing, a backpack, a scuba knife, boots, and a "conductive energy weapon[]" similar to a Taser. Police also found a military-type flashlight with a red lens conducive to night vision, a black neoprene mask, camouflage face makeup, a pair of gloves with "hardened knuckles[,]" and a roll of black duct tape.

{¶6} Mr. Cobb was indicted on two counts of aggravated murder in violation of R.C. 2903.01(A) and two counts of aggravated murder in violation of R.C. 2903.01(B), as well as counts charging him with kidnapping, aggravated robbery, felonious assault, retaliation, tampering with evidence, grand theft, abuse of a corpse, possessing criminal tools, and domestic violence. Three of the aggravated murder charges were accompanied by death penalty specifications. Mr. Cobb pleaded guilty to one count of aggravated murder and one count of kidnapping as well as the counts that charged him with aggravated robbery, felonious assault, retaliation, tampering with evidence, grand theft, abuse of a corpse, possessing criminal tools, and domestic violence. The remaining charges were dismissed. On February 28, 2013, the trial court sentenced him to life in prison without the possibility of parole for aggravated murder, along with concurrent prison terms for the remaining offenses. Mr. Cobb appealed, and this Court affirmed his conviction. *See generally State v. Cobb*, 9th Dist. Summit No. 26847, 2014-Ohio-1923.

{¶7} Knowing that a female placed the pizza order that lured A.B. to the scene of the murder, however, police continued to seek information related to the possible involvement of Ms. Stefanko in the crimes. The detective who investigated A.B.'s death initiated contact with Mr.

Cobb in jail, and he routinely monitored public information posted on Ms. Stefanko's social media. Although Mr. Cobb initially refused to speak with the detective, he sent the detective a letter in December 2017 that provided a lead in the investigation. The detective subsequently interviewed and obtained a statement from Mr. Cobb's mother, C.C., who ultimately provided him with the audio recording of a conversation between her and Ms. Stefanko that occurred in 2014. Mr. Cobb and another family friend ultimately provided statements to the detective as well.

{¶8} On November 19, 2019, Ms. Stefanko was indicted for two counts of aggravated murder, two counts of murder, and one count each of kidnapping, aggravated robbery, felonious assault, retaliation, tampering with evidence, grand theft of a motor vehicle, gross abuse of a corpse, and possessing criminal tools. The State dismissed all of the charges other than aggravated murder, murder, kidnapping, and aggravated robbery based on the relevant statutes of limitations.

{¶9} The trial court conducted a series of pretrials in late 2019 and early 2020 and, on January 29, 2020, set the case for trial on June 10, 2020. On March 9, 2020, however, the Governor of the State of Ohio issued an executive order that declared a state of emergency in response to the spread of COVID-19. *See Executive Order 2020-01D Declaring a State of Emergency*, https://coronavirus.ohio.gov/static/publicorders/Executive-Order-2020-01D.pdf (accessed July 22, 2022). In the following months, the Supreme Court of Ohio and the Summit County Court of Common Pleas issued a number of administrative orders governing the conduct of cases during the COVID-19 public health emergency.

{¶10} Ms. Stefanko's case proceeded during this timeframe. During a pretrial conducted remotely by videoconference on August 31, 2022, the trial court noted that the issue of in-person testimony, especially with respect to Mr. Cobb, would be addressed at a later date. Both parties objected to the trial court's suggestion that the trial could be conducted remotely using

videoconferencing technology. Commenting on Mr. Cobb's availability for in-person testimony, the trial court noted that "in light of restrictions in place by the Summit County Sheriff's Department in protecting inmates and employees from the public in Summit County * * * Mr. Cobb may never be transported back from the ODRC to the Summit County Jail." Ms. Stefanko "[v]ery vehemently" objected, and the State also indicated a preference for live testimony given the gravity of the case. At the conclusion of the pretrial, the trial court noted that the trial could go forward in person, by videoconference, or in a hybrid format.

{¶11} During pretrials conducted during September and October, the parties continued to express their preference for an in-person trial, while the trial court reiterated that the trial could go forward using videoconference technology in some form. On October 19, 2020, the trial court addressed the matter of rising COVID-19 infections in the State of Ohio and informed counsel that everyone in the courtroom would be required to wear masks in the event the trial went forward. On October 26, 2020, the trial court stated on the record, without elaboration, that "[Mr. Cobb] will not be transported from the Ohio Department of Rehabilitation & Correction for purposes of trial." In response to an inquiry by the State, the trial court stated that decisions related to revised COVID-19 protocols would be made closer to the November trial date.

{¶12} The trial court conducted the final pretrial on November 5, 2020, eight days before voir dire was scheduled to commence. At that time, the trial court confirmed that everyone in the courtroom—including witnesses—would be required to wear masks. The trial court also noted that voir dire would be conducted during a three-hour period between 8:30 a.m. and 11:30 a.m. on November 13, 2020, informed the parties that the courtroom would be closed to in-person spectators, but noted that the entirety of the trial would be live-streamed by Court TV, whose

representatives would be attending in person. Ms. Stefanko reiterated her objection to Mr. Cobb's remote testimony.

{¶13} On the eve of trial, the State moved to conduct the trial entirely through remote videoconferencing, citing "spiking" COVID-19 case numbers. In the alternative, the State moved to continue the trial. Ms. Stefanko opposed the motion to conduct the trial virtually and, in the event that the trial court determined to do so, moved for a continuance until such time as the trial could be conducted entirely in person. In so doing, Ms. Stefanko reiterated her objection to any witnesses testifying by videoconferencing technology.

{¶14} Trial commenced in-person with voir dire on Friday, November 13, 2020. Ms. Stefanko renewed all of her objections raised and motions filed before trial. The trial was conducted over a period of eight days from November 16, 2020, through November 25, 2020. Mr. Cobb testified from prison using videoconferencing technology. Two other out-of-state witnesses testified in the same manner. On Wednesday, November 25, 2020, the trial court summoned the jury to the courtroom and, after stating on the record that "the Court has been advised that you have indicated difficulty in reaching a verdict[,]" the trial court instructed the jury pursuant to *State v. Howard*, 42 Ohio St.3d 18 (1989), paragraph two of the syllabus.

{¶15} Later the same day, the jury found Ms. Stefanko guilty of aggravated murder in violation of R.C. 2903.01(A)/(G) and murder in violation of R.C. 2903.02(A)/(D). The jury found her not guilty of the remaining undismissed charges. On December 29, 2020, over a month after the jury reached a verdict but before sentencing, Ms. Stefanko moved for a mistrial and new trial, arguing that under the circumstances, the *Howard* charge was unconstitutionally coercive. The trial court conducted a hearing on the motion by videoconference on June 3, 2021, and denied the motion on June 10, 2021. On July 30, 2021, the trial court sentenced Ms. Stefanko to a term of

life imprisonment with parole eligibility after thirty years, having merged the aggravated murder and murder offenses for purpose of sentencing.

{¶16} Ms. Stefanko appealed, raising six assignments of error.

II.

**ASSIGNMENT OF ERROR NO. 1**

THE COVID-19 PROCEDURES USED BY THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO A FAIR TRIAL, DUE PROCESS OF LAW, AND TO CONFRONT WITNESSES UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION.

{¶17} Mr. Stefanko's first assignment of error argues that the trial court violated her right to confront the witnesses against her by permitting three witnesses to testify remotely via two-way videoconferencing technology and requiring witnesses to wear masks while testifying.

{¶18} "The Sixth Amendment gives a criminal defendant the right 'to be confronted with the witnesses against him.'" *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988). By its terms, the Confrontation Clause "confers at least 'a right to meet face to face all those who appear and give evidence at trial.'" *Id*. at 1016, quoting *California v. Green*, 399 U.S. 149, 175 (1970) (Harlan, J., concurring).[1] The right of confrontation includes the right to cross examine witnesses and "'impeach [their testimony] in every mode authorized by the established rules  governing the trial * * * of cases.'" *Coy* at 1017, quoting *Kirby v. United States*, 174 U.S. 47, 55 (1899). But it is not limited to that interest: it also encompasses "'the right physically to face those who testify against [a defendant][.]'" *Coy* at 1017, quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). In this respect, the United States Supreme Court has observed:

---

[1] "Shakespeare was thus describing the root meaning of confrontation when he had Richard the Second say: 'Then call them to our presence—face to face, and frowning brow to brow, ourselves will hear the accuser and the accused freely speak....'" *Coy* at 1016, quoting Richard II, Act 1, sc. 1.

The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." Z. Chafee, The Blessings of Liberty 35 (1956), quoted in *Jay v. Boyd*, 351 U.S. 345, 375-376, 76 S.Ct. 919, 935–936, 100 L.Ed. 1242 (1956) (Douglas, J., dissenting). It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. * * * [Face-to-face testimony] may confound and undo the false accuser * * *.

*Coy* at 1019. Consequently, in *Coy*, the Supreme Court rejected the argument that child victims could testify while shielded from a defendant's view in every case, by statute, without "individualized findings that these particular witnesses needed special protection * * *." *Id*. at 1021.

{¶19} The Supreme Court revisited these issues two years later in *Maryland v. Craig*, 497 U.S. 836, 845 (1990). In *Craig*, the Supreme Court considered whether a statutory procedure that permitted the testimony of child witnesses in child abuse proceedings by one-way closed circuit video violated the confrontation rights of defendants. *Id.* at 840. The Supreme Court reiterated the concerns addressed in *Coy*, *see Craig* at 846-847, but also noted that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* at 845. In that context, the Supreme Court observed that "'the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact[]'" but that the guarantee is not absolute. *Id*. at 844, quoting *Coy* at 1016. Instead, "'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial' * * * that 'must occasionally give way to considerations of public policy and the necessities of the case[.]'" (Emphasis in original.) *Id*. at 849, quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980) and *Mattox v.*

*United States*, 156 U.S. 237, 243 (1895). The right to confrontation may therefore be satisfied in the absence of face-to-face testimony when the "denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig* at 850.

{¶20} In *Craig*, however, the Supreme Court also noted that, consistent with its decision in *Coy*, "the trial court * * * made individualized findings that each of the child witnesses needed special protection[.]" *Craig* at 845. *See also Coy* at 1021, quoting *Bourjaily v. United States*, 483 U.S. 171, 183 (1987) (emphasis in *Bourjaily sic*) (noting that "as to exceptions from the normal implications of the Confrontation Clause * * * something more than * * * [a] generalized finding * * * is needed when the exception is not 'firmly * * * rooted in our jurisprudence.'"). Indeed, the Supreme Court reiterated that in that context, "[t]he requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Craig* at 855.

{¶21} The *Craig* standard has also been applied by some courts to the remote testimony of adult witnesses. *See*, *e.g.*, *United States v. Carter*, 907 F.3d 1199, 1206-1207 (9th Cir.2018); *United States v. Abu Ali*, 528 F.3d 210, 240-241 (4th Cir.2008); *Horn v. Quarterman*, 508 F.3d 306, 314-320 (5th Cir.2007). One court of appeals, however, has distinguished the use of one-way video technology such as that used in *Craig* from two-way video technology that "preserve[s] the face-to-face confrontation celebrated by *Coy*[.]" *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir.1999). In light of that distinction, the United States Court of Appeals for the Second Circuit determined that the question is one committed to the discretion of the trial court with consideration for the availability of the witness and the materiality of the anticipated testimony. *Id.*, citing

Fed.R.Crim.P. 15. In other words, the Second Circuit concluded that "[u]pon *a finding of exceptional circumstances*, * * * a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." (Emphasis added.) *Gigante* at 81. *See also United States v. Cole*, N.D.Ohio No. 1:20-cr-424, 2022 WL 278960, *4 (Jan. 31, 2002) (noting that the United States Court of Appeals for the Sixth Circuit has "endorsed" the analysis employed in *Gigante*). Regardless of which standard courts apply, however, the requirement of individualized—rather than generalized—determinations holds fast.

**{¶22}** These cases provide the framework through which courts have recently considered whether concerns surrounding the COVID-19 public health emergency justify remote testimony by two-way videoconference technology. Among federal courts, some courts have permitted such remote testimony when, by virtue of age or other personal characteristics, an individual witness is at heightened risk for complications due to COVID-19. *See*, *e.g.*, *United States v. Avenatti*, S.D.New York No. 19-CR-374 (JMF), 2022 WL 103494, *2 (Jan. 11, 2022); *United States v. Griffin*, S.D.New York No. 11-cr-936 (RJS), 2021 WL 3188264, *1-2 (July 28, 2021). One court has also permitted remote testimony when travel restrictions create "logistical barriers" to in-person testimony. *See*, *e.g.*, *United States v. Salamey*, M.D.Florida No. 8:19-cr-298-VMC-SPF, 2022 WL 35992, *2-3 (Jan. 4, 2022). Yet another court permitted some witnesses to testify remotely during 2020 based solely on the distance that they would have to travel in order to appear in person. *See United States v. Davis*, D.Delaware Cr. A No. 19-101-LPS, 2020 WL 6196741, *4 (Oct. 23, 2020). Other courts, however, have questioned whether this procedure is constitutionally permissible under any circumstances. *See*, *e.g.*, *United States v. Davis*, W.D.Arkansas No. 5:19-CR-500033-TLB, 2021 WL 3572670, *8 (Aug. 12, 2021); *United States v. Pangelinan*, D.Kansas No. 19-10077-JWB, 2020 WL 5118550 (Aug. 31, 2020) (denying a motion for remote testimony,

even given the individual circumstances of witnesses, because "there are reasonable alternatives which would allow this case to proceed, including a continuance.").

{¶23} The courts of other states have permitted testimony under similar circumstances. *See*, *e.g.*, *Commonwealth v. Cuevas*, Sup.Ct.Pa. No. 930 MDA 2021, 2022 WL 2112998, *8-9 (June 13, 2022) (remote testimony of a witness who awakened on the day of trial with a fever); *State v. Milko*, 21 Wash.App.2d 279, 290-294 (2022) (remote testimony of a witness whose child had compromised health); *State v. Roberson*, Minn.App. No. A21-0585, 2022 WL 664184, *2-3 (Mar. 7, 2022) (remote testimony of an immunocompromised witness); *State v. Johnson*, Az.App. No. 1-CA-CR 21-0015, 2021 WL 5457502, ¶ 8-10 (Nov. 23, 2021) (remote testimony permitted based on a witness's age and "significant health issues" as well as the risk of travel out of state and "the need to minimize the risk and spread of COVID-19"); *State v. Comacho*, 309 Neb. 494, 515-516 (2021) (remote testimony of a witness who had tested positive for COVID-19). State courts have also concluded that generalized concerns related to the spread of COVID-19 do not overcome confrontation concerns. *See*, *e.g.*, *X.D.M. v. Juvenile Officer*, Mo.App. No. WD 84520, 2022 WL 2431680 (July 5, 2022); *State v. Tate*, 969 N.W.2d 378, 388-389 (Minn.App. 2022); *T.H. v. State*, 2d Dist.Fla. No. 2D20-3217, 2022 WL 815047, *4-5 (Mar. 18, 2022); *C.A.R.A. v. Jackson Cty. Juvenile Office*, 637 S.W.3d 50, 65-66 (Mo.2022); *Commonwealth v. Gardner*, Ky.App. No. 2020-CA-1383-MR, 2021 WL 3573304, *3-5 (Aug. 13, 2021).

{¶24} Whether applying the *Craig* standard or, in the case of federal courts, the standard set forth in *Gigante*, the courts in each of these cases made specific determinations related to the testimony of the witnesses at issue in light of the challenges presented by the COVID-19 public health emergency and with consideration for the concerns underlying the Confrontation Clause.

These cases demonstrate, therefore, that the requirements of the Confrontation Clause are not lightly set aside.

{¶25} In Ohio, however, several courts have approached these issues in a different manner. In *State v. Castonguay*, 2d Dist. Darke No. 2021-CA-2, 2021-Ohio-3116, the Court concluded that the defendant's confrontation rights were not violated by the remote testimony of three out-of-county witnesses who had no health issues related to COVID-19. *Id*. at ¶ 39. In so doing, the Second District Court of Appeals noted that "the effect of the Covid-19 'conundrum' has served to make it a matter of public policy and health concerns to allow witnesses to testify remotely." *Id*. In the alternative, the Court noted that the trial court ensured that the reliability aspects of confrontation were met and, regardless, that "the trial court's admission of the witnesses' remote testimony [was] harmless beyond a reasonable doubt." *Id*. at ¶ 40-41, citing *State v. Durst*, 6th Dist. Huron No. H-18-019, 2020-Ohio-607, ¶ 66-68. Similarly, in *State v. Banks*, 1st Dist. Hamilton Nos. C-200395, C-200396, 2021-Ohio-4330, ¶ 23-26, the First District Court of Appeals determined that in light of the Supreme Court of Ohio's COVID-19 guidance to local courts, remote testimony was permissible, and, in the alternative, any error was harmless.

{¶26} Neither the administrative orders adopted by the Supreme Court of Ohio nor the administrative orders of the Summit County Court of Common Pleas, however, established the necessity of remote testimony in any individual case or contemplated that their provisions would trump application of the Confrontation Clause. With respect to the waiver of certain in-person appearances, for example, the Supreme Court of Ohio emphasized that "[a]ppearance, service, or oral argument by use of technology shall be allowed *if it sufficiently guarantees the integrity of the proceedings and protects the parties' interests and rights*." (Emphasis added.) *See 7/31/2020 Administrative Actions*, 159 Ohio St.3d 1461, 2020-Ohio-3861. Guidance provided to Ohio courts

on May 7, 2020, encouraged the use of technology, while emphasizing the courts' responsibility to "protect[] the rights of the public we serve." *Updated Guidance for the Courts of Ohio* (May 7, 2020), https://www.supremecourt.ohio.gov/coronavirus/resources/ ChiefCommunications/UpdatedCourtGuidance_050720.pdf (accessed July 22, 2022). Indeed, the Supreme Court of Ohio acknowledged its inability to suspend rights guaranteed by the Ohio and United States Constitutions. *See Speedy Trial Requirements* (Oct. 28, 2020), https://www.supremecourt.ohio.gov/coronavirus/resources/ChiefCommunications/SpeedyTrial Requirements_102820.pdf (accessed July 22, 2022). On that same date, while encouraging the use of technology to avoid in-person appearance whenever possible, the Chief Justice of the Supreme Court of Ohio advised local courts that she regarded "the cessation of jury trials for the time being[]" to be "a smart move[.]" *Covid-19 Guidance* (Oct. 28, 2020), https://www.supremecourt.ohio.gov/coronavirus/resources/ChiefCommunications/COVID-19Guidance_102820.pdf (accessed July 22, 2022).

{¶27} Consistent with this assessment, on November 6, 2020, the Summit County Court of Common Pleas suspended all jury trials through December 31, 2020, "unless authorized by the Administrative Judge."[2] The order contemplated, however, that inmates from the Summit County Jail could be transported to the courthouse in the event that a trial took place. This order extended an order adopted by the Court of Common Pleas on October 1, 2020, and modified an order dated September 2, 2020, that permitted jury trials when speedy-trial rights were implicated.

{¶28} The trial court permitted three witnesses to testify using two-way videoconferencing technology: Mr. Cobb, who testified from prison; M.T., the former manager of the Domino's Pizza on Turkeyfoot Lake Road, who had moved out of state since the murder; and

---

[2] As apparent from the record, the Administrative Judge presided over the trial of this case.

F.P., the custodian of records for Verizon Wireless. Ms. Stefanko objected to their remote testimony. The trial court did not consider any evidence or make any individualized determinations regarding the availability of these witnesses except to note that M.T. and F.P. lived in other states; the record is silent with respect to whether it was possible for them to travel to Summit County and whether they had medical reasons for not doing so.

{¶29} With respect to Mr. Cobb, the trial court's only statements on the record regarding his availability occurred more than two months before trial. At that time, the trial court stated:

> Speaking of Mr. Cobb, he currently is in the Ohio Department of Rehabilitation [and] Correction serving a life sentence. As a result of the public health crisis - - and I know the State of Ohio last week asked to have him transported - - there would be a variety of issues with his transport, including the fact that typically when the ODRC releases an inmate to a local jurisdiction, COVID-19 testing is put in place and then the inmate is quarantined for a certain period of time. I bring that up to you folks just so that you understand the practical aspects.
>
> * * *
>
> Again, though, in light of restrictions in place by the Summit County Sheriff's Department in protecting inmates and employees from the public in Summit County * * * Mr. Cobb may never be transported back from the ODRC to the Summit County Jail.
>
> So the Court will take into consideration all of the information that you have provided today while making a decision regarding the transport of Mr. Cobb back to Summit County.

The record is silent with respect to what restrictions were in place and whether it was possible to comply with those restrictions in the two months before trial. In addition, there is no suggestion that Mr. Cobb was at increased risk from COVID-19 or that he himself was experiencing symptoms that could place other individuals at risk. Ms. Stefanko's speedy-trial rights were not a consideration. Indeed, it is notable that both Ms. Stefanko and the State of Ohio expressed reservations about the use of remote testimony in this case and that both favored a continuance instead of a hybrid procedure when the incidence of COVID-19 increased on the eve of trial. As

noted above, the Summit County Court of Common Pleas had, in fact, suspended all jury trials through December 31, 2020, while this case was pending.

{¶30} In light of *Coy* and *Craig*, this Court cannot conclude that the circumstances presented by the COVID-19 public health emergency justify remote testimony in a criminal trial as a matter of course and without the determinations contemplated by the United States Supreme Court. There may, of course, be times when a defendant does not object to the use of remote testimony. There may be other occasions when, having considered the issue in the manner contemplated by the United States Supreme Court, a trial court determines that the remote testimony of individual witnesses is warranted by the circumstances and that the safeguards of the Confrontation Clause are adequately addressed. Neither situation, however, is present in this case.

{¶31} Nor can this Court conclude, as in *Castonguay*, 2021-Ohio-3116, and *Banks*, 2021-Ohio-4330, that the error was harmless. A constitutional error, such as a violation of a defendant's rights under the Confrontation Clause, "'can be held harmless if [this Court] determine[s] that it was harmless beyond a reasonable doubt.'" *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 46, quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 78. "'Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Ricks* at ¶ 46, quoting *Conway* at ¶ 78. *See generally Weaver v. Massachusetts*, ___ U.S. ___, 137 S.Ct. 1899, 1907 (2017), quoting *Chapman v. California*, 386 U.S. 18, 24 (1967). The burden of demonstrating that constitutional error is harmless beyond a reasonable doubt falls to the State. *Weaver* at 1907.

{¶32} Mr. Cobb pleaded guilty to the murder of A.B. His testimony connected Ms. Stefanko to the murder by identifying her as the person who drove him to the murder scene and who lured A.B. there by ordering a pizza. He also testified that after he murdered A.B., Ms. Stefanko followed him as he drove A.B.'s car to the cornfield in order to dispose of the body. Mr. Cobb also testified that Ms. Stefanko drove him home from that location then rode back to the scene of the murder with the intention of cleaning it.

{¶33} The import of Mr. Cobb's testimony was not limited to the facts to which he himself testified, however. Mr. Cobb's mother and his daughter, G.C., also testified. Both were subject to cross-examination regarding their motivation for testifying against Ms. Stefanko, and Mr. Cobb's testimony served to corroborate and explain their statements. His testimony also provided context for Ms. Stefanko's statements in the recorded conversation between her and Mr. Cobb's mother that was excerpted during trial and the testimony of M.B., a family friend who also testified regarding statements made by Ms. Stefanko after the murder. In short, therefore, Mr. Cobb's testimony was also a link through which the jury could have inferred that Ms. Stefanko was knowingly complicit in the planning and commission of A.B.'s murder from beginning to end.

{¶34} This Court cannot conclude that the Confrontation Clause violation in the remote testimony of Mr. Cobb was harmless beyond a reasonable doubt. Accordingly, we must sustain Ms. Stefanko's first assignment of error with respect to his testimony. Having done so, we need not consider the remaining arguments in her first assignment of error.

{¶35} Ms. Stefanko's first assignment of error is sustained.

**ASSIGNMENT OF ERROR NO. 2**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL[.]

**ASSIGNMENT OF ERROR NO. 3**

THE TRIAL COURT ERRED BY ADMITTING HEARSAY STATEMENTS FROM EMAILS THAT WERE NOT ADMITTED INTO EVIDENCE AND NOT PROPERLY AUTHENTICATED[.]

## ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S REQUEST FOR INDIVIDUAL VOIR DIRE AND PLACING ARBITRARY TIME LIMITS AND RESTRICTIONS ON THE PROCESS[.]

## ASSIGNMENT OF ERROR NO. 5

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL[.]

**ASSIGNMENT OF ERROR NO. 6**

THE VERDICT OF THE TRIAL COURT CONVICTING APPELLANT OF MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

**{¶36}** In light of this Court's resolution of Ms. Stefanko's first assignment of error, her remaining assignments of error are moot. *See* App.R. 12(A)(1)(c).

### III.

**{¶37}** Ms. Stefanko's first assignment of error is sustained. Her second, third, fourth, fifth, and sixth assignments of error are moot. The judgment of the Summit County Court of Common Pleas is reversed, and this matter is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

                                       _____

                                       LYNNE S. CALLAHAN
                                       FOR THE COURT

TEODOSIO, P. J.
CARR, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.