[Cite as *Masterson v. Brody*, 2022-Ohio-3429.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MARK MASTERSON,
ADMINISTRATOR, ET AL.,                  :

         Plaintiffs-Appellees,          :

                            :          No. 111043

         v.

                            :

ZACHARY BRODY, ET AL.,                  :

         Defendants-Appellants.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 29, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-16-857804

---

### *Appearances:*

Law Office of John T. Forristal and John T. Forristal, *for appellees*.

The Law Office of Donald Gallick, LLC, and Donald Gallick, *for appellant* Zachary Brody.

MICHELLE J. SHEEHAN, J.:

{¶ 1} This appeal involves allegations of errors in a civil trial for wrongful death claims stemming from a prior criminal case. During Labor Day weekend in

2011, a group of Bowling Green State University graduates and former fraternity brothers rented two cabins owned by the Island Club in Put-in-Bay. The group included defendant-appellant Zachary Brody, Cameron Parris, and Clifton Knoth. Philip Masterson (referred to as "Masterson" hereafter), who was not part of the group, was drinking with some members of the group outside one of the cabins in the early morning hours of September 5, 2011. Masterson did not come home later that day. His body was discovered the following day by his family, severely beaten, in the woods behind the cabins. Brody was eventually convicted of involuntary manslaughter in Masterson's death. Parris was convicted of falsification.

{¶ 2} In 2016, Mark Masterson, Phil Masterson's brother and the administrator of his estate ("plaintiff estate" or "plaintiff" hereafter), filed a wrongful death lawsuit against Brody, Parris, Knoth, several other members of their group, and certain corporate entities related to the Island Club. The trial court granted summary judgment in favor of the corporate entities. The claims against Brody, Parris, and Knoth were tried to a jury.

{¶ 3} In 2021, following an extensive trial, the jury awarded substantial compensatory and punitive damages to plaintiff against Brody, Parris, and Knoth. Brody and Knoth appealed separately from the judgment in 8th Dist. Cuyahoga Nos. 111043 and 111048.[1]

---

[1] Plaintiff filed an appeal, 8th Dist. Cuyahoga No. 111035, challenging the summary judgment granted in favor of the corporate defendants. This court sua sponte made appeal Nos. 111035, 111043, and 111048 companion cases. Plaintiff also filed a cross-appeal in Knoth's appeal.

**{¶ 4}** In Appeal No. 111043, Brody raises the following assignments of error on appeal for our review:

> I. The trial court erred by denying the motion to bar recovery per O.R.C. 2307.60(B)(2) and then refused to instruct the jury on the affirmative defense provided by the statute.
>
> II. Brody was denied his constitutional right to a fair trial and due process due to misconduct and inflammatory statements by plaintiff's counsel.
>
> III. The trial court erred in denying Brody's Civil Rule 50 motion on the negligence claim since no medical testimony was produced.
>
> IV. The trial court erred in allowing an expert witness to testify remotely, over objection, without finding that the witness was unavailable and without qualifying the witness as an expert.
>
> V. The trial court erred by denying defendant opportunity to present testimony on "net worth" before allowing the jury to award punitive damages.

**{¶ 5}** After a thorough review of the record and applicable law, we find no merit to the issues raised and affirm the trial court's judgment.

**Events Leading to the Victim's Death**

**{¶ 6}** The Island Club is located in the village of Put-in-Bay on South Bass Island. The Island Club consists of dozens of cabins, many of which are rented to short-term visitors to the island. Brody and his friends rented two cabins, cabin 90 and 92, to spend the Labor Day weekend drinking and partying on the island. A member of the group, Matthew Brotzki, signed the rental agreement for cabin 90, where Brody and most of the codefendants stayed; Knoth stayed in cabin 92, but

was drinking on the deck of cabin 90 before Masterson showed up around 3 a.m. on Monday morning in the vicinity of cabin 90.

{¶ 7} The only witnesses to the events following Masterson's arrival at cabin 90, which ultimately resulted in his death, were the defendants. The defendants were evasive and uncooperative when testifying on cross-examination in the instant wrongful death trial. As a result, many details of the events were not able to be ascertained.

{¶ 8} It is unclear how Masterson, who stayed at a different part of the island, ended up at cabin 90. A taxi driver told the police that he picked up Masterson and another individual from a bar and dropped them off at cabin 67 around 2:30 a.m. Masterson appeared highly intoxicated. By all accounts, Masterson arrived in the area of cabin 90 on a golf cart with an unidentified man

{¶ 9} Brody was asleep at the time Masterson arrived, but Parris and Knoth were among those still awake and drinking on the deck. Knoth acknowledged that he invited Masterson and his companion to join them and drink. Around 5 a.m., only Knoth and Parris remained on the deck with Masterson and the unidentified man.

{¶ 10} At one point, Parris was done drinking and went inside. Tension then developed between Knoth and Masterson. According to Knoth, he asked Masterson and his companion to leave. They refused and became aggressive, calling him "little bitch" and "faggot," and told him to "quit being a pussy." Knoth went inside the

cabin to tell Parris about it. Knoth also claimed at one point Masterson was pounding on the door of the cabin, wanting to enter the cabin.

{¶ 11} Parris claimed that when he went outside to check on the situation after being told about Masterson being aggressive, Masterson approached him in a menacing manner, saying "what's up" and, to diffuse the tension, Parris responded "chicken butt" jokingly. Masterson backed off, and Parris went inside the cabin.

{¶ 12} Parris and Knoth then went to wake up Brody, who was known to be a good fighter and trained in martial arts, to confront Masterson. According to Parris, he said to Brody "there's these two guys out here and they're not leaving. Can you help me get them to leave?"

{¶ 13} Plaintiff and the defendants disputed as to what occurred next. Plaintiff believed that when Brody came out of the cabin, he ambushed Masterson from behind with the help of Parris. While Parris distracted Masterson, Brody put him in a chokehold, choked him to near unconsciousness, and then beat him viciously.

{¶ 14} Brody, on the other hand, claimed that his friends felt threatened and he tried to deescalate the situation. He successfully convinced the unidentified man to leave, but Masterson refused to leave. Brody claimed Masterson started the fighting by punching him in the head first. He put Masterson in a chokehold but he escaped the chokehold, and the two engaged in a mutual fight. Brody admitted that after the fight, he dragged Masterson, semiconscious at the time, by the ankle down the steps of the deck and placed him in the wood-line behind the cabin.

{¶ 15} Both Parris and Knoth claimed they were inside the cabin when the fighting took place on the deck, but both were apparently aware of the severity of Masterson's injuries — Knoth testified that after the fighting, Parris came inside the cabin and said, "I think Zach might have killed this guy."

{¶ 16} Parris, who had been cleaning up the cabin in preparation for their departure that morning, washed Masterson's blood off the deck. When he was cleaning up the yard area behind the deck, he could hear Masterson breathing in the wood-line. Parris admitted he found Masterson's wallet and gave it to Brody, who removed the identification from the wallet and threw it in a trash can.

{¶ 17} After Brody moved Masterson to the wood-line, he woke up Dustin McCullough, who was also staying in cabin 90, and took him to see Masterson. According to Brody, Masterson had moved himself 15 to 20 feet away from where Brody initially placed him and was still breathing. Brody asked him if he was okay, and Masterson mumbled profanities at him. According to McCullough, Brody then kicked Masterson with his boot and Masterson groaned after being kicked. According to Brody, he checked on Masterson one last time before he left. Masterson was still alive and again mumbled profanities at him.

{¶ 18} It was disputed as to whether other members of the group staying in cabin 90 knew about the incident immediately, but everyone in that cabin left on the first ferry, leaving the island around 8 a.m. Knoth, who stayed at cabin 92 that weekend, went back to sleep for several hours before he left the island later in the morning.

{¶ 19} Later that day, Knoth drove Brody from Brody's apartment in Bowling Green to the ferry to Put-in-Bay. Sarah Partlo, Brody's friend, met them there. Brody and Partlo took the ferry to the island. They rented a six-person golf cart and looked for Masterson behind the cabins. According to Brody, Masterson had moved again from where Brody last saw him.

{¶ 20} By the time Brody returned that evening, Masterson was deceased. To conceal Masterson's body, Brody grabbed a grill cover to cover it and moved it further into the woods behind cabin 94, where it was eventually discovered by Masterson's family, who looked for him all over the island the next day. For her involvement, Partlo later served six months in jail.

{¶ 21} According to Knoth, when he learned a body was found behind the cabins, he and Brotzki went to the police together. He denied any responsibility for Masterson's death, claiming he was inside cabin 90 when Brody assaulted Masterson on the deck. He denied seeing Masterson lying in the wood-line and claimed he did not know Brody had dragged Masterson to the woods until after he left the island. In the statement Knoth gave to the police, Knoth stated Parris handed him a shirt to dispose of. When asked at trial if Parris gave him Masterson's bloody undershirt to dispose of, Knoth claimed Parris handed him something "wadded up" and he threw it in a trash can, but was not sure if it was a shirt.

{¶ 22} Parris also denied any responsibility, claiming he too stayed inside the cabin when Brody assaulted Masterson. He claimed he did not recall handing Knoth Masterson's bloody undershirt but admitted that he cleaned Masterson's

blood off the deck and gave Masterson's wallet to Brody. Plaintiff believed that Parris was on the deck when Brody attacked Masterson and helped distract Masterson to allow Brody to ambush Masterson. Plaintiff also maintained Parris was involved in helping Brody move Masterson further into the woods to keep him out of sight of those who were unaware of the incident.

{¶ 23} The next day (Tuesday), Brody, Parris, and Partlo met at Partlo's apartment to create a cover story for Masterson's death. They tried to reach Knoth, but unbeknownst to them, Knoth had gone to the Perrysburg police department to give a statement about the incident.

{¶ 24} When Masterson failed to return home on Monday, his family called the police and also drove to Put-in-Bay to look for him that night, but could not find him. The family, including Masterson's parents, returned to the island to search for him again the next day. They received a call from the Island Club in the afternoon informing them a wallet missing an identification was found in the trash can around cabin 90. The family then went to search the area. Mark Masterson, the victim's brother, found a bloody undershirt in the backyard behind cabin 90. Soon after he spotted a foot sticking out from underneath a tarp. Masterson's mother passed out when Mark Masterson showed her the bloody shirt. When found by his family, Masterson did not have shoes or clothing on, except for his shorts, which were pulled down to the ankle.

{¶ 25} Masterson's injuries were severe. Both his death certificate and coroner's report were admitted as exhibits. The death certificate lists "blunt

abdominal trauma" as the cause of death. The coroner's report indicates that Masterson's pancreas was lacerated, he had a substantial amount of blood in his abdomen, his left testicle was bruised, and his neck was badly bruised.

{¶ 26} Brody was subsequently charged with one count of involuntary manslaughter, a first-degree felony, and two counts of tampering with evidence, a third-degree felony. He entered a plea of guilty to these counts, and the trial court imposed maximum, consecutive sentences for a total of 16 years in prison. Brody appealed his sentence, and the Sixth District affirmed the trial court's judgment in *State v. Brody*, 6th Dist. Ottawa No. OT-12-022, 2013-Ohio-1708. Knoth was not charged. For his part, Parris was convicted of falsification, a first-degree misdemeanor.[2]

_____

[2] Parris entered a nonprosecution agreement with the state and provided information of events leading to the victim's death. However, after his interview with law enforcement, the prosecutor decided he had not made a full and truthful disclosure, in breach of the agreement. Specifically, he allegedly omitted information about finding Masterson's wallet, the existence of Masterson's blood on the deck, picking up Masterson's undershirt and giving it to Knoth to dispose of, and the fact that Brody and his friend Sarah Partlo went back to the island to further cover up the crime scene. After Brody was convicted of involuntary manslaughter following a guilty plea, Parris was charged with three counts of tampering with evidence and three counts of obstructing justice, one count of failure to report a death, and one count of falsification (regarding his interview with the police.) The trial court found the state did not prove Parris substantially breached the agreement because he provided sufficient information to prosecute Brody and dismissed all counts except for falsification, a first-degree misdemeanor, for which he received probation. The dismissal was affirmed by the Sixth District on appeal. *State v. Parris*, 6th Dist. Ottawa No. OT-14-015, 2014-Ohio-4863.

**The Wrongful Death Lawsuit**

{¶ 27} In 2016, Mark Masterson, Phil's brother, filed the instant wrongful death complaint as the administrator of Phil Masterson's estate, along with several family members including his parents, three brothers, and a sister, as well as Phil Masterson's fiancée Ayako Hobbs. Before trial, the trial court granted motions filed by the defendants to dismiss the individual claims of the named plaintiffs, leaving the administrator of Phil Masterson's estate the only plaintiff at the time of trial. In addition to Brody, Parris, Knoth, several other members of the fraternity group staying in cabin 90, Sarah Partlo, and several corporate entities related to the Island Club were also named as defendants.

{¶ 28} The complaint, which was not clearly drafted, set forth eight causes of action against the corporate and individual defendants. Four of the counts were alleged against the individual defendants. Count 1 alleged a common law negligence claim. Count 4 alleged all the individual defendants were involved in assaulting Masterson and none of them took any action to provide assistance to a disabled person to prevent further harm. Count 5 alleged all the individual defendants knew Brody was prone to violence and breached a duty to Masterson by failing to protect him from Brody. Count 7 alleged the defendants knew Masterson was near death but failed to seek assistance for him and thereby breached the duty imposed in

R.C. 2305.45, which obligates a person "who finds a disabled person" to "make a reasonable effort to notify a law enforcement officer or medical practitioner."[3]

{¶ 29} As to damages, the complaint sought wrongful death damages and damages for Masterson's pain and suffering prior to his death. Plaintiff requested compensatory and punitive damages.

{¶ 30} The trial court subsequently dismissed the intentional tort claim against the codefendants except Brody. Ultimately, the claims tried and considered by the jury were a battery claim against Brody, negligence claims against Brody, Knoth, and Parris, and a claim predicated on R.C. 2305.45 against Brody, Knoth, and Parris.[4]

**Jury's Award of Compensatory and Punitive Damages and the Trial Court's Reduction of the Jury Award**

{¶ 31} The jury returned verdicts in favor of plaintiff estate against the three defendants. In its answers to the interrogatories, the jury found that (1) Brody committed battery and Brody, Knoth, and Parris were negligent and also violated R.C. 2305.45; (2) Masterson did not assume the risk of harm, nor was he comparatively negligent; and (3) each defendant's conduct was a proximate cause of

---

[3] Count 6 alleged Masterson's fiancée Hobbs suffered loss of consortium, and it was dismissed by the trial court because Hobbs is not a statutory beneficiary for a wrongful death claim. The remaining counts were alleged against the corporate defendants, which are the subject of Appeal No. 111035.

[4] The codefendants included Brian Cultice, Dustin McCullough, and Matt Brotzki. Before trial, the court granted Brian Cultice's motion for summary judgment, and Dustin McCullough and Sarah Partlo settled with plaintiff. Matt Brotzki was granted a directed verdict after trial.

damages. Furthermore, the jury assigned the percentage of tortious conduct attributable to each party as Brody 60%, Knoth 10%, and Parris 30%.

{¶ 32} The compensatory damages in this case include damages on the survivorship claim for the deceased's conscious pain and suffering and damages on the statutory wrongful death claim. Regarding the survivorship claim for Masterson's conscious pain and suffering, the jury assessed $3 million dollars. Regarding the wrongful death claim, the jury awarded over $11 million dollars: (1) $1.1 million dollars for loss of support from the decedent's reasonably expected earning capacity; (2) $3,357,000 for the loss of the decedent's society, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training and education; and (3) $6.4 million dollars for mental anguish.

{¶ 33} After the jury returned the compensatory verdicts, the trial proceeded to the punitive-damages phase. The trial court instructed the jury on the elements of punitive damages. The parties made closing arguments without presenting new evidence. After deliberation, the jury assessed punitive damages of $10 million dollars: $6 million dollars against Brody, $3 million dollars against Parris, and $1 million against Knoth, in accordance with the fault apportionment among the defendants.

{¶ 34} The trial court subsequently reduced the award of $3 million dollars for the survivorship claim to $250,000, pursuant to the damages cap set forth in R.C. 2315.18(B)(2). Knoth filed a postjudgment motion to reduce the punitive

damages based on lack of net worth, and the trial court reduced his punitive damages to zero pursuant to R.C. 2315.21(B)(2)(b).[5] Neither Brody nor Parris filed a similar postjudgment motion to reduce the punitive damages.

{¶ 35} Brody and Knoth separately appealed from the judgment. Brody raises five assignments of error in his appeal, which we now address in the order presented.

**R.C. 2307.60(B)**

{¶ 36} Under the first assignment of error, Brody argues the trial court erred in denying his motion for a jury instruction and failing instruct the jury pursuant to R.C. 2307.60(B)(2).

{¶ 37} In 2016, Brody filed a motion arguing that R.C. 2307.60(B)(2)(b) barred recovery in this case because Masterson may have engaged in criminal act such as trespassing and/or a misdemeanor assault prior to his death. In a ruling in 2018, the trial court denied the motion but noted that "nothing in this ruling operates to prevent Brody from asserting R.C. 2305.60(B) as an affirmative defense to the parties' claims."

{¶ 38} When the presentation of testimony was concluded, Brody's counsel asked the trial court for a jury instruction regarding R.C. 2307.60(B)(2). The trial court did not give the instruction as requested.[6]

---

[5] The reduction of Knoth's punitive damages is the subject of the plaintiff's cross-appeal in Appeal No. 111048.

[6] Brody also moved for directed verdict on grounds of R.C. 2307.60, and the trial court denied it.

{¶ 39} We review matters regarding jury instructions for an abuse of discretion. *See, e.g., State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35. The trial court is vested with discretion to determine whether the evidence adduced at trial is sufficient to warrant a particular instruction. *State v. Austin*, 8th Dist. Cuyahoga Nos. 106215 and 106530, 2018-Ohio-3048, ¶ 54, citing *State v. Fulmer*, 117 Ohio St. 3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72. *See also State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998); and *State v. Lessin*, 67 Ohio St.3d 487, 494, 620 N.E.2d 72 (1993). Therefore, we review the evidence to determine if the trial court abused its discretion in deciding that the evidence was insufficient to support the requested charge.

{¶ 40} R.C. 2307.60 bars recovery when a plaintiff commits a criminal act that is the proximate cause of the injury for which relief is sought. Our review of the trial testimony does not indicate a R.C. 2307.60 jury instruction was warranted. Section (2) of R.C. 2307.60 ("Civil recovery for criminal act; record of conviction as evidence; when offender barred from recovering in tort action") provides, in part:

> (B) (2) Recovery on a claim for relief in a tort action is barred to any person or the person's legal representative if any of the following apply:
>
> (a) The person has been convicted of or has pleaded guilty to a felony, or to a misdemeanor that is an offense of violence, arising out of criminal conduct that was a proximate cause of the injury or loss for which relief is claimed in the tort action.
>
> (b) The person engaged in conduct that, if prosecuted, would constitute *a felony, a misdemeanor that is an offense of violence*, an attempt to commit a felony, or an attempt to commit a misdemeanor that is an offense of violence and that conduct was a proximate cause

of the injury or loss for which relief is claimed in the tort action, regardless of whether the person has been convicted of or pleaded guilty to or has been charged with committing the felony, the misdemeanor, or the attempt to commit the felony or misdemeanor.

(Emphasis added.)

{¶ 41} As evidence of Masterson's "criminal act," Brody points to the testimony of the codefendants that Masterson became aggressive after drinking for a while on the deck; taunted, threatened, and intimidated Knoth; refused to leave when being told the party was over; and pounded on the cabin door. As the trial court properly determined, none of the cited testimony is sufficient evidence to show that Masterson's conduct, even if the testimony was found credible, constituted "a felony, a misdemeanor that is an offense of violence, an attempt to commit a felony, or an attempt to commit a misdemeanor that is an offense of violence," and that the conduct was the proximate cause of Masterson's death. R.C. 2307.60(B)(2)(b). Accordingly, the trial court did not abuse its discretion in not giving an instruction based on R.C. 2307.60(B)(2)(b). The first assignment of error lacks merit.

**Misconduct by Counsel**

{¶ 42} Under the second assignment of error, Brody argues misconduct and inflammatory statements by plaintiff's counsel deprived him of a fair trial and a new trial is warranted.

{¶ 43} Civ.R. 59 provides that a new trial may be granted upon the ground of "misconduct of * * * prevailing party." Civ.R. 59(A)(2). A new trial may also be

granted upon the ground of "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." Civ.R. 59(A)(4).

{¶ 44} Brody, however, never filed a motion for a new trial pursuant to Civ.R. 59. On appeal, he cites case law precedent to support his claim that a new trial is warranted due to plaintiff's counsel's conduct inflaming the jury's passions, which resulted in an improper and excessive jury award.

{¶ 45} Specifically, Brody maintains that, when plaintiff's counsel cross-examined him and his codefendants, counsel frequently interrupted them without letting them complete their answer, made statements without asking questions, argued with them, and asked compound questions. Brody also alleges plaintiff's closing argument was replete with improper inflammatory remarks.

{¶ 46} When reviewing the claim of improper conduct of counsel, we must consider the claim in the context of the whole trial. *Secrest v. Gibbs*, 11th Dist. Lake No. 2003-L-083, 2005-Ohio-2074, ¶ 77, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). We are also mindful that a trial is by nature adversarial in nature and tension and acrimony is inevitable, and "[w]e cannot, nor should we attempt to make the courtroom a quarantine from the feelings which drive competent, zealous advocacy and * * * it is incumbent upon us to pay careful heed to charges of inflammatory or prejudicial conduct without overmanaging the process." *Secrest* at ¶ 77.

{¶ 47} In this case, Brody, Parris, and Knoth were the only witnesses to the events leading to Masterson's death. To make its case in chief, plaintiff's counsel

had to rely exclusively on the elicitation of testimony from the defendants on cross-examination.

{¶ 48} "Great leeway is granted to both parties on cross-examination." *State v. Brooks*, 176 Ohio App.3d 210, 2008-Ohio-1726, 891 N.E.2d 797, ¶ 18 (10th Dist.) Furthermore, trial judges enjoy wide latitude to impose reasonable limits on cross-examination based on concerns about harassment or prejudice. *State v. Cash*, 193 Ohio App.3d 224, 2011-Ohio-1404, 951 N.E.2d 486 (2d Dist.), citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

{¶ 49} As our review of the trial transcript reflects, the defendants were often evasive, failed to answer questions asked, and frequently claimed an inability to recall when asked about details of the events. Their testimony would also contradict their prior depositions and contradict one another's testimony. Plaintiff's counsel's frustration was palpable throughout the trial. On many occasions counsel appeared to be exasperated by the elusiveness of the testimony and would turn hostile, sarcastic, hyperbolic, and even theatrical.

{¶ 50} The transcript reflects that objections were frequently made during plaintiff's counsel's cross-examination of the defendants and the trial court sustained many of the objections. For example, when counsel tried to ask a codefendant a hypothetical question, the trial court sustained an objection and reminded counsel "just stick with the facts." When plaintiff's counsel interrupted Brody's testimony on several occasions, the trial court would admonish counsel and instruct counsel to allow the witness to finish his answer. When counsel argued

with Brody, the trial court would remind counsel to ask the witness questions instead of making statements.

{¶ 51} "'[T]here is a fine line between zealous and overzealous advocacy that attorneys should not cross.'" *Musial Offices, Ltd. v. Cuyahoga Cty.*, 8th Dist. Cuyahoga No. 108810, 2021-Ohio-2325, ¶ 30, quoting *Cleveland Indus. Square, Inc. v. Dzina*, 8th Dist. Cuyahoga Nos. 85336, 85337, 85422, 85423, and 85441, 2006-Ohio-1095, ¶ 55. Our review of the trial transcript indicates the trial court exercised reasonable control and supervision over plaintiff's counsel's cross-examination of Brody (and the codefendants) and guarded against improper overzealous advocacy by counsel. In light of Brody and the codefendant's evasiveness when asked to provide details of the events leading to Masterson's death, we find that counsel's cross-examination, while zealous, was not so outrageous or heinous as to deprive Brody a fair trial resulting in an excessive jury award.

{¶ 52} Brody also complains plaintiff's counsel committed misconduct when making closing argument. As an example, he points to counsel's comparison of the defendants to Joe Lovitz, a comedian who portrayed a habitual liar on Saturday Night Live, and counsel's inflammatory personal remarks about Brody's counsel.

{¶ 53} As a general rule, great latitude is afforded counsel in presenting closing argument to the jury and "[t]he assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." *Pang v. Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990), paragraphs two and three.

**{¶ 54}** While some of the remarks made by plaintiff's counsel during closing argument appear to be overtly accusatory and inflammatory, the trial court in this case properly instructed the jury that "[t]he evidence does not include any statement of the lawyers during the case" and "closing arguments, while they are designed to assist you in carrying out your function, are not evidence to rely on in deciding the disputed issues of fact." The jury is presumed to follow the proper instructions of the trial court. *Pang*, paragraph four of the syllabus ("[a] presumption always exists that the jury has followed the instructions given to it by the trial court"). Considering the closing argument in the context of the entire trial, we cannot say that counsel's conduct was so outrageous as to call into question whether the verdict was rendered upon the evidence presented.[7] The second assignment of error is without merit.

**Civ.R. 50 Motion Based on Lack of Medical Expert Testimony**

---

[7] Brody cites *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, which stated that "'if "there is room for doubt whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party."'" *Id.* at ¶ 36, quoting *Pesek v. Univ. Neurologists Assn., Inc.*, 87 Ohio St.3d 495, 721 N.E.2d 1011 (2000), quoting *Warder, Buchnell & Glessner Co. v. Jacobs*, 58 Ohio St. 77, 85, 50 N.E. 97 (1898). In that case, however, appellant appealed from the trial court's granting of a new trial based on Civ.R. 59(A)(4). Brody quoted the statement out of context — it was made while the court concluded that "where competent, credible evidence exists to support the trial court's finding of an excessive verdict given under passion or prejudice or misconduct of counsel, the order granting a new trial is not an abuse of discretion and should remain undisturbed." *Id.* The Supreme Court of Ohio explained that appellate courts should defer to trial judges, who witnessed the trial firsthand and relied upon more than a cold record to justify a decision. The Supreme Court of Ohio concluded that the trial court acted within its discretion in resolving the doubt in favor of the party claiming prejudice and an excessive verdict. *Harris* is not pertinent here because in this case we are not asked to review whether the trial court abused its discretion in resolving the doubts in plaintiff's favor — Brody never filed a motion for a new trial under Civ.R. 59.

{¶ 55} The third assignment of error relates to Brody's Civ.R. 50 motion for directed verdict. After the presentation of evidence, Brody moved for a directed verdict arguing that plaintiff's negligence claim regarding a failure to seek medical attention for Masterson was not supported by evidence because plaintiff failed to present expert medical testimony to demonstrate proximate causation, i.e., Masterson would have survived had medical attention been sought for him. The trial court denied the motion. Brody claims the trial court erred.

{¶ 56} Civ.R. 50 governs a motion for a directed verdict, which may be made at the close of the evidence. Pursuant to Civ.R. 50(A)(4), a motion for directed verdict shall be granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *."

{¶ 57} It is long settled that a motion for a directed verdict tests the sufficiency of the evidence rather than the weight of the evidence or the credibility of witnesses, and, if there is substantial competent evidence to support the non-moving party upon which evidence reasonable minds might reach different conclusions, the court should deny directed verdict. *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119, 671 N.E.2d 252 (1996). A motion for a directed verdict must be denied "where substantial evidence upon which reasonable minds may differ supports the nonmoving party's side of the case." *Hall v. Kreider Mfg.*, 10th Dist. Franklin No. 03AP-272, 2003-Ohio-6661, ¶ 6, citing *Posin v. A.B.C. Motor Court*

*Hotel*, 45 Ohio St.2d 271, 74, 344 N.E.2d 334 (1976). We review de novo a trial court's order granting or denying of a motion for directed verdict. *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14.

{¶ 58} The issue here involves whether medical testimony is necessary to establish proximate cause. "Where the issue of causal connection between an injury and the specific subsequent physical disability involves questions which are matters of common knowledge, medical testimony is not necessary in order to submit the case to the jury." *White Motor Corp. v. Moore*, 48 Ohio St.2d 156, 357 N.E.2d 1069 (1976).

{¶ 59} The testimony reflects that Masterson was still conscious after being beaten by Brody. When Brody took McCullough to see Masterson, Masterson had moved about 15 feet and he mumbled profanities at Brody. Before Brody left the island, he checked on Masterson again and Masterson again mumbled profanities. When Brody returned to the island later in the afternoon, Masterson was deceased but, according to Brody, he had moved himself yet again before he died. The testimony thus reflects a long lapse of time between Masterson's initial injuries and his eventual death, from which the jury can infer that he may have survived if he had received medical care.

{¶ 60} Construing the evidence presented at trial under the standard for directed verdict, i.e., most strongly in favor of plaintiff, we agree with the trial court that there was substantial evidence presented at trial to support proximate causation upon which reasonable minds may differ as to whether Masterson would have

survived if medical attention had been sought for his injuries. Under the standard for directed verdict, the certainty from a medical expert is not necessary in this case for the trial court to deny a directed verdict.

**{¶ 61}** Accordingly, the trial court properly denied Brody's motion for directed verdict predicated on a lack of expert testimony for proximate causation. The third assignment of error is without merit.

## Remote Testimony by the Expert on Economic Damages

**{¶ 62}** Under the fourth assignment of error, Brody argues that "[t]he trial court erred in allowing an expert witness to testify remotely over objection, without finding that the witness was unavailable and without qualifying the witness as an expert."

**{¶ 63}** Regarding the remote testimony of plaintiff's expert Dr. Stan Smith, who testified about damages in this case, the trial court allowed the expert to testify by Zoom, over the objection of Brody's counsel. The transcript reflects that before the testimony began, the trial court addressed the jury as follows:

> Ladies and Gentlemen of the jury, the law and the rules of court do allow some witnesses to appear by videoconference, particularly experts who have schedules that can be unpredictable, just like ours, and particularly people who are out-of-state, as I understand this witness is.
>
> So he will be testifying, as you can see, by Zoom. This witness is no more or less important than witnesses who appear live. It is just because of scheduling, we are doing it for that reason.
>
> So his testimony should be judged the same way you judge the testimony of any witness who appears like before you.

{¶ 64} In support of his claim, Brody cites two criminal cases from this court concerning the Confrontation Clause and the propriety of remote testimony. The Confrontation Clause of the Sixth Amendment, however, is not applicable to civil cases. *See, e.g., Jones v. Mahoning Cty. Clerk of Court*, 7th Dist. Mahoning No. 18 MA 0074, 2019-Ohio-1097, ¶ 14; *In re Burchfield*, 51 Ohio App.3d 148, 555 N.E.2d 325 (4th Dist.1988); and *State Auto. Mut. Ins. Co. v. Lytle*, 10th Dist. Franklin No. 84AP-424, 1985 WL 9887 (Mar. 5, 1985) ("Because this is a civil case, the Confrontation Clause has no application.").

{¶ 65} Notably, in one of the cases cited by Brody, *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, this court found testimony by a two-way video link preserved the reliability elements of confrontation. *Marcinick*, at ¶ 22. In *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573 (8th Dist.), the other case cited by Brody to support his claim, this court found testimony by Skype not in violation of the Confrontation Clause because the witness was subject to cross-examination and the jury was able to observe the witness's demeanor. *Oliver* at ¶ 22.[8]

---

[8] Brody filed a notice of supplemental authority and cited a third criminal case, *State v. Stefanko*, 9th Dist. Summit No. 30079, 2022-Ohio-2569. In that case several witnesses testified by way of videoconferencing due to the Covid pandemic. The appellate court held that the remote testimony violated the Confrontation Clause right of the defendant, who was tried for aggravated murder, under the particular circumstances of the case. Because the Confrontation Clause is not applicable in civil cases, this case is similarly not pertinent.

{¶ 66} Here, the transcript reflects Dr. Smith was cross-examined at great length, his testimony was not interrupted by any technical glitches, and the jury was able to observe his demeanor during his testimony. Brody's contention regarding Dr. Smith's testimony by Zoom is unsupported by the record or prior case law precedent.

{¶ 67} Brody also claims the trial court erred in allowing plaintiff's expert witness to testify because he was never qualified as an expert witness. Brody's counsel argued at trial that the expert must be "certified" in order to be qualified as an expert pursuant to Evid.R. 702. The trial court overruled the objection.

{¶ 68} Evid.R. 702 governs testimony by experts. Evid.R. 702(B) provides that a witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. The transcript reflects that before Dr. Smith, an economist, testified about the economic damages, he testified at great length regarding his knowledge, experience, education, and training. He received a Ph.D. in economics from the University of Chicago; authored the first textbook in the field of forensic economics; did extensive professional work in the field of economics since 1980s; published articles in peer-reviewed economics journals and lectured at economics associations on topics including litigation economics; and has been qualified as an expert in many court cases, including in Cuyahoga County. The record reflects that, after providing lengthy testimony about his qualifications, Dr. Smith proceeded to testify about the instant case without the court officially declaring him as being qualified as an expert. When Brody's counsel

objected later regarding Dr. Smith's qualification as an expert after he completed his testimony, the trial court overruled the objection and found him to be qualified as an expert.

{¶ 69} "'The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court.'" *Georgetown of the Highlands Condominium Owners' Assn. v. Nsong*, 2018-Ohio-1966, 113 N.E.3d 192, ¶ 56 (8th Dist.), quoting *State v. Wages*, 87 Ohio App.3d 780, 786, 623 N.E.2d 193 (8th Dist.1993). Moreover, "a formal declaration is not required where the witness is in fact qualified to render expert testimony pursuant to Evid.R. 702." *State v. Vargas*, 10th Dist. Franklin No. 10AP-952, 2012-Ohio-6368, ¶ 44, citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038. The trial court's determination regarding Dr. Smith's qualifications as an expert is supported by the record, and we do not find an abuse of discretion. The fourth assignment of error is without merit.

**Net Worth Evidence for Punitive Damages**

{¶ 70} Under the fifth assignment of error, Brody claims the trial court did not afford him an opportunity to present evidence regarding his net worth before the jury on the issue of punitive damages.

{¶ 71} R.C. 2315.21 provides that the trial for a plaintiff's claim for compensatory damages and a claim for punitive damages shall be bifurcated upon the motion of any party. The initial stage of the trial shall relate only to the presentation of evidence, and a determination by the jury, with respect to whether

the plaintiff is entitled to recover compensatory damages. If the jury determines in the initial stage of the trial that the plaintiff is entitled to recover compensatory damages, evidence may then be presented in the second stage of the trial, and a determination by that jury shall be made, with respect to whether the plaintiff additionally is entitled to recover punitive damages. R.C. 2315.21(C)(2) provides that punitive damages are not recoverable unless the actions or omissions of a defendant demonstrate malice (or egregious fraud).

{¶ 72} The transcript here reflects that, after the jury returned the verdict and awarded compensatory damages against each of the three defendants, the trial court inquired if counsel wished to present evidence in the punitive damages phase of the trial. Brody's counsel replied that "[o]ther than net worth, no, that's all we would get into." The codefendants' counsel then proceeded to make closing argument before the jury deliberated on punitive damages; the matter regarding net worth evidence was not brought up again by any defense counsel at trial.

{¶ 73} Post jury verdicts, Knoth filed a motion to reduce the punitive damages pursuant to R.C. 2315.21 and attached financial documents to demonstrate his net worth was zero at the time of the incident.[9] The trial court granted Knoth's

---

[9] When the defendant is a small employer or an individual, R.C. 2315.21(D)(2)(b) limits the award of punitive damages as follows:

> If the defendant is a small employer or individual, the court shall not enter judgment for punitive or exemplary damages in excess of the lesser of two times the amount of the compensatory damages awarded to the plaintiff from the defendant or ten per cent of the employer's or individual's net

motion and reduced the punitive damages assessed against him to zero pursuant to the statute.  No such post-verdict motion was filed by Brody.

{¶ 74} Brody argues he was not afforded an opportunity to present evidence of his net worth to the jury.  Our review of the transcript reflects that the trial court proceeded to the punitive-damages phase of the trial without the defendants presenting evidence regarding their net worth.  No objection was raised by the defendants, however.  More importantly, R.C. 2315.21 does not expressly mandate that the trier of fact consider the net worth of a defendant such as Brody when awarding punitive damages.  The statute only mandates such a consideration by the trier of fact where a residential facility is involved.  R.C. 2315.21(G).[10]

---

worth when the tort was committed up to a maximum of three hundred fifty thousand dollars, as determined pursuant to division [(B)(2)] of this section.

[10] R.C. 2315.21(G) provides:

(G) When determining the amount of an award of punitive or exemplary damages against either a home or a residential facility licensed under section 5123.19 of the Revised Code, the trier of fact shall consider all of the following:
(1) The ability of the home or residential facility to pay the award of punitive or exemplary damages based on the home's or residential facility's assets, income, and *net worth*;
(2) Whether the amount of punitive or exemplary damages is sufficient to deter future tortious conduct;
(3) The financial ability of the home or residential facility, both currently and in the future, to provide accommodations, personal care services, and skilled nursing care.

(Emphasis added.)

{¶ 75} While R.C. 2315.21 does not require the jury to consider the net worth of a defendant such as Brody when awarding punitive damages, the statute limits punitive damages in accordance with a defendant's net worth. R.C. 2315.21(D)(2)(b) provides that, if the defendant is an individual, "the court shall not enter judgment for punitive or exemplary damages in excess of * * * ten per cent of [the individual's] net worth when the tort was committed." The Supreme Court of Ohio has also instructed that "[e]vidence of a defendant's net worth may be considered by the fact-finder in determining appropriate punitive damages, but this evidence is not required before otherwise proper punitive damages may be awarded to a prevailing party." *Wagner v. McDaniels*, 9 Ohio St.3d 184, 184, 459 N.E.2d 561 (1984), paragraph two of the syllabus. *See also Angus v. Ventura*, 9th Dist. Medina No. 2740-M, 1999 Ohio App. LEXIS 157 (Jan. 27, 1999) (evidence of a defendant's net worth is relevant in determining the amount of punitive damages to award; however, the jury is not required to consider such evidence and its failure to do so is not grounds for reversal). Accordingly, the fifth assignment of error lacks merit.

{¶ 76} Having reviewed the record and applicable law, we find no merit to the five assignments of error raised by Brody and therefore affirm the judgment of the trial court.

{¶ 77} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

SEAN C. GALLAGHER, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR